**Richard A. REYNOLDS,
Plaintiff-Appellant,**

**v.**

**INGALLS SHIPBUILDING DIVISION,
LITTON SYSTEMS, INC.,
Defendant-Appellee.**

**No. 85–4193.**

United States Court of Appeals,
Fifth Circuit.

April 25, 1986.

---

Judy M. Guice, Paul S. Minor, Biloxi, Miss., for plaintiff-appellant.

Karl Wiesenburg, William F. Jordan, Litton Systems, Pascagoula, Miss., for defendant-appellee.

Before GOLDBERG, RANDALL and JOHNSON, Circuit Judges.

RANDALL, Circuit Judge:

Richard Reynolds appeals from a decision granting summary judgment for the defendant. Because we find that Reynolds was covered by the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950, and because we find that the Act provides Reynolds' exclusive remedy, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Richard Reynolds worked as a shipfitter for Litton Systems, Inc. ("Litton") at the Ingalls Shipyard in Pascagoula, Mississippi. A contract between Litton and the United States Navy called for Litton to construct a ship, the USS Ticonderoga, and the contract further required that Litton carry out certain sea trials prior to handing the ship over to the Navy. Litton took the ship to sea in May, 1982, to execute the required

sea trials. Reynolds volunteered to sail on the ship, and he was assigned to the steward's department where his duties were to wash and stow the mess utensils.

Reynolds was washing pots and pans when the ship began to execute high speed turns. The maneuvers caused soapy water to spill out of the sink and onto the deck where Reynolds was standing. Reynolds slipped in the soapy water and injured his knee. Reynolds brought suit to recover for his knee injury, predicating his action on four grounds: negligence of Litton under the Jones Act, 46 U.S.C. § 688; negligence of Litton under the Longshoremen's and Harbor Workers' Compensation Act, (hereinafter "LHWCA" or the "Act"), 33 U.S.C. § 905(b);[1] unseaworthiness of the Ticonderoga; and general maritime negligence. Initially, a federal magistrate granted Litton's motion for partial summary judgment, dismissing all of Reynolds' claims except the § 905(b) action. Subsequently, the district court also granted Litton's motion for summary judgment on the § 905(b) action.

Reynolds applied for and has received compensation from Litton under the LHWCA. He brings this appeal, however, in an effort to recover additional compensation. Reynolds offers two alternative proposals. First, he contends that the district court erred in concluding that Reynolds was covered at all by the LHWCA. Reynolds' position is that there is a disputed question of fact as to whether Reynolds' injury occurred within the jurisdictional limits of the LHWCA: that is, whether his injury occurred while the Ticonderoga was on the "navigable waters of the United

States." 33 U.S.C. § 903(a).[2] Reynolds contends that if the injury occurred while the ship was outside the three-mile territorial limit, then the LHWCA does not apply, meaning that Reynolds is not covered under the LHWCA and is free to sue Litton under a theory of general maritime negligence.

If the court should determine that the LHWCA does apply, however, then Reynolds' second argument becomes relevant. The compensation Reynolds has received under the LHWCA provides his exclusive remedy unless he falls within an exception delineated by § 905(b) of the Act. Section 905, entitled "Exclusiveness of Liability," provides that, under some circumstances, employees injured by a vessel's negligence may bring suit against the vessel.[3] In addition, the Act defines "vessel" as "any vessel ... said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21). Reynolds' argument proceeds on the basis of two fundamental assertions: that Reynolds, at the time he was injured, was not engaged in "shipbuilding" activity but was rather performing duties of a steward; and that Litton was an "operator" of the Ticonderoga and therefore amenable to suit under § 905(b) as the "vessel."

We conclude that Reynolds was a longshoreman covered by the LHWCA and that § 905(b) specifically bars Reynolds' action against Litton. As a result, the compensation which Reynolds has received under the LHWCA is his exclusive remedy.

---

**1.** 905(b) provides, in part, as follows:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person ... may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title.... If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer.

**2.** Section 903(a), the Coverage provision, extends the Act to injuries which occur "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)."

**3.** *See supra* note 1.

## II. JONES ACT STATUS.

Reynolds argues that the district court erred in granting summary judgment for the defendant on the matter of Reynolds' Jones Act seaman status. The question of seaman status under the Jones Act is generally a factual issue best suited for resolution by a jury. *Ardoin v. J. Ray McDermott & Co.*, 641 F.2d 277, 280 (5th Cir. 1981), *appeal after remand*, 684 F.2d 335 (5th Cir.1982). However, when the undisputed material facts establish beyond question as a matter of law the lack of seaman status, summary judgment is appropriate. In this case, the facts relevant to the determination of seaman status are undisputed, and those facts compel the conclusion that, as a matter of law, Reynolds was not a seaman.[4]

Sitting en banc, this court recently reviewed the principles relevant to determining seaman status, originally distilled in *Offshore Company v. Robison*, 266 F.2d 769 (5th Cir.1959). *See Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d 1067 (5th Cir. 1986) (en banc). A worker is a seaman if (1) "the employee was assigned permanently to a vessel or performed a substantial part of his work on the vessel," and (2) "the employee contributed to the function of the vessel or to the accomplishment of its mission." *Barrett*, 781 F.2d at 1073, 1074. We explained in *Barrett* that the second *Robison* prong is easily satisfied since various "Supreme Court cases require such a broad definition of 'aid to navigation.'" *Barrett*, 781 F.2d 1067, at 1073. However, it is clear in the present case that Reynolds cannot satisfy the first prong of the *Robison* test since the Ticonderoga was not a "vessel in navigation." Without a vessel in navigation, however, there can be no Jones Act coverage.

In *Williams v. Avondale Shipyards, Inc.*, 452 F.2d 955 (5th Cir.1971), this court held that a ship engaged in sea trials makes no warranty of seaworthiness; the ship is undergoing trials precisely to determine what, if any, additional work needs to be done. More important for our purposes here, a ship undergoing sea trials is not "in navigation" for purposes of the Jones Act. 452 F.2d at 958. Consequently, "[a] shipbuilder's worker [such as Reynolds] assisting in the building and ultimate commissioning of a launched but uncompleted vessel floating *or maneuvering* in navigable waters is not a seaman within the meaning of the Jones Act, because his vessel is not yet an instrumentality of commerce—private or public—and is therefore not 'in navigation.'" 452 F.2d at 958 (emphasis added); *see also Bouvier v. Krenz*, 702 F.2d 89, 91 n. 3 (5th Cir.1983) (adhering to *Williams* and explaining that "participati[on] in sea trials does not confer seaman status"). Reynolds simply was not a Jones Act seaman. He was a shipfitter covered under the LHWCA who volunteered to sail on the Ticonderoga during her brief sea trials.

## III. APPLICABILITY OF THE LHWCA.

Neither Reynolds nor Litton disputes that the LHWCA applies to shipfitters such as Reynolds. To hold that the Act ceased to apply merely because Reynolds was injured while the Ticonderoga was more than three miles offshore would be to impart an exceedingly parochial meaning to a statute which is to be construed liberally to protect injured maritime workers.

Reynolds argues that since his injury occurred while the Ticonderoga was on the high seas, he falls outside the coverage of the LHWCA.[5] The LHWCA extends only

---

4. *See Guidry v. Continental Oil Co.*, 640 F.2d 523, 529 (5th Cir.), *cert. denied*, 454 U.S. 818, 102 S.Ct. 96, 70 L.Ed.2d 87 (1981) (upholding granting of summary judgment "where the facts establish beyond question as a matter of law" that injured employee is not a Jones Act seaman).

5. The district court did not make a finding as to where the injury actually occurred. Reynolds acknowledges this point and asks for a remand with instructions to the district court to determine where the injury occurred. However, Litton concedes that at the time Reynolds slipped and fell the ship was beyond the three-mile territorial limit *and was on the high seas.* Thus,

to the "navigable waters of the United States," and Reynolds asserts that the high seas are not navigable waters of the United States. We conclude, however, that navigable waters of the United States may include the high seas, and that both the legislative history of the LHWCA as well as the congressional objectives underlying the Act mandate that the Act apply to Reynolds.

## A. *Navigable Waters of the United States.*

We begin with the language of the Act itself. "[C]ompensation shall be payable ... if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier ... or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)." 33 U.S.C. § 903(a). The Act does not define the phrase "navigable waters of the United States," but the phrase has been often construed in admiralty cases. *See, e.g., The Plymouth*, 70 U.S. (3 Wall.) 20, 33, 18 L.Ed. 125 (1865) (referring to "the high seas, or other navigable waters within admiralty cognizance"); *The Eagle*, 75 U.S. (8 Wall.) 15, 20–21, 19 L.Ed. 365 (1868) ("public navigable waters" include "lakes, and waters connecting them, ... the high seas, bays, and rivers navigable from the sea"); *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563 (1871) 19 L.Ed. 999 (waters "constitute navigable waters of the United States within the meaning of acts of Congress ... when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries"); *The Montello*, 78 U.S. (11 Wall.) 411, 415, 20 L.Ed. 191

(1871) (water "can only be deemed a navigable water of the United States when it forms ... a highway" "over which commerce is or may be carried on with other States or foreign countries"); *Ex parte Easton*, 95 U.S. (5 Otto) 68, 72, 24 L.Ed. 373 (1877) ("Public navigable waters ... of course include the high seas"); *Atlantic Transport Co. v. Imbrovek*, 234 U.S. 52, 59, 34 S.Ct. 733, 58 L.Ed.1208 (1914) (referring to "the high seas or other navigable waters").[6]

The "high seas," as the term is currently understood, do begin at a line three miles offshore, but it has never been understood that the navigable waters of the United States end there. The "high seas" simply encompass "all parts of the sea that are not included in the territorial sea or in the internal waters of a State." 1 *Benedict on Admiralty* § 141, at 9–2 (7th ed.). Benedict goes on to explain that "[m]uch of the maritime legislation enacted since 1910 [including the LHWCA] applies to all the navigable waters of the United States without distinction—to the high seas, the coastal waters and sounds and bays, the Great Lakes, the inland rivers and lakes." *Id.* at 9–46 & n. 8.

Language in the LHWCA lends further support to the conclusion that the Act's use of the term "navigable waters" includes the high seas. For example, although the "Coverage" section of the Act does not use the phrase "high seas," the "Administrative" section does, referring to compensation districts which will "include the high seas." *See Cove Tankers Corp. v. United Ship Repair, Inc.*, 528 F.Supp. 101, 107–09 (S.D.N.Y.1981) (*Cove Tankers I* ), *aff'd*, 683 F.2d 38 (2d Cir.1982). In addition, the original "Application" provision of the Act pro-

we are faced squarely with the question of whether the LHWCA can apply to Reynolds even though the Ticonderoga was executing maneuvers on the high seas at the time Reynolds sustained his injury.

6. We are not unaware of, but simply unpersuaded by, the argument that navigable waters *do* end at the high seas and that the high seas are therefore beyond the reach of the LHWCA. *See,*

*e.g.,* Millus & Manes *Longshoremen's & Harbor Workers' Compensation Act and its Extensions* 77–80 (1978) (quoted in *Cove Tankers Corp. v. United Ship Repair, Inc.,* 528 F.Supp. 101, 107–08 n. 9 (S.D.N.Y.1981) (*Cove Tankers I* ), *aff'd,* 683 F.2d 38 (2d Cir.1982)). *But cf.* 1 *Benedict on Admiralty* 9–46–47 (7th Ed.1974 & Supp. 1980).

vided that "[t]his act shall apply to any employment performed on a place within the admiralty jurisdiction of the United States, except employment of a local concern and of no direct relation to navigation and commerce: but shall not apply to employment as master or crew of a vessel." S. 3170, 69th Cong., *quoted in* 1A *Benedict on Admiralty* § 7, at 1–11 (7th ed.). The admiralty jurisdiction of the United States clearly includes the high seas. The original provision was deemed too confusing, however, so it was rewritten to provide that compensation would be payable "but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law." Section 903 of the 1927 Act, *quoted in id.* at 1–11.

Finally, the "Definitions" section of the Act defines "United States" as "the several States and Territories and the District of Columbia, *including the territorial waters thereof*." 33 U.S.C. § 902(9) (emphasis added). If "navigable waters" were to exclude the high seas and encompass only territorial waters, then the phrase "navigable waters of the United States" in § 903 would be unnecessary and redundant since the term United States includes, by definition, the nation's territorial waters. The fact that the Act specifies navigable waters in the section pertaining to coverage (§ 903) while using territorial waters to define the United States (§ 902(9)) suggests a distinction between the two. The language of the Act itself, therefore, supports the conclusion that the LHWCA does not cease to operate at the three-mile line.

**B.** *Legislative History.*

Judicial consideration of the reach of the LHWCA has focused predominantly on how far the Act extends inward.[7] *See, e.g., P.C. Pfeiffer Co. v. Ford,* 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 255 (1979); *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977); *Boudreaux v. American Workover, Inc.,* 680 F.2d 1034 (5th Cir.1982) (en banc), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983); *Texports Stevedore Co. v. Winchester,* 632 F.2d 504 (5th Cir. 1980) (en banc), *cert. denied,* 452 U.S. 905, 101 S.Ct. 303, 69 L.Ed.2d 406 (1981); *Newport News Shipbuilding & Dry Dock v. Graham,* 573 F.2d 167 (4th Cir.), *cert. denied,* 439 U.S. 979, 99 S.Ct. 563, 58 L.Ed.2d 649 (1978); *Alabama Dry Dock & Shipbuilding Co. v. Kininess,* 554 F.2d 176 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977); *Dravo Corp. v. Maxin,* 545 F.2d 374 (3d Cir.1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977). Accordingly, the various analyses of the original legislative history and the history pertaining to the 1972 amendments of the LHWCA have searched especially for indications of the Act's landward reach. This case involves the Act's seaward extent. In this regard, it merits emphasis that the context we confront is highly unusual, involving, as it does, a shipfitter, ordinarily accustomed to working on or near shore, who happens to have been several nautical miles out to sea. Given the peculiarity of this circumstance, it is not surprising that the legislative history touching on this issue is scarce. It is not, however, entirely non-existent.

The original version of the "Administrative" provisions of the Act did not specify that the compensation districts would in-

---

**7.** We have located only two reported federal court opinions discussing the applicability of the LHWCA to the high seas. *Cove Tankers Corp. v. United Ship Repair, Inc.,* 528 F.Supp. 101 (S.D.N.Y.1981) (*Cove Tankers I*), *aff'd,* 683 F.2d 38 (2d Cir.1982). In *Williams v. Avondale Shipyards, Inc.,* 452 F.2d 955 (5th Cir.1971), we expressly did not decide whether the term "navigable waters of the United States" extends to the high seas or is limited to territorial waters. 452

F.2d at 959–61. *See also Szumski v. Dale Boat Yards, Inc.,* 90 N.J.Super. 86, 216 A.2d 256 (1966) stating LHWCA covers injury sustained on the high seas), *rev'd on other grounds,* 48 N.J. 401, 226 A.2d 11, *cert. denied,* 387 U.S. 944, 87 S.Ct. 2077, 18 L.Ed.2d 1331 (1967). *Cove Tankers I,* an extremely thorough analysis of the legislative history of the LHWCA, concluded that, in the context of the Act, "navigable waters of the United States" includes the high seas.

clude the high seas. However, as Judge Sand explained in *Cove Tankers I*, the Senate modified the bill to read as it currently does, explicitly including the high seas. *See Cove Tankers I*, 528 F.Supp. at 110. Judge Sand acknowledged, and our review of the history has confirmed, that the legislative history is not fully illuminating. However, although the legislative history does not expressly define "navigable waters of the United States," the legislative hearings pertaining to the Act, and to the 1972 and 1984 amendments to the Act, refer periodically to "navigable waters" without suggesting that the phrase is confined to territorial waters. For example, in explaining the 1984 amendments to section 3 of the Act, the House Report explains that the Act covers employees who work "over the water." House Report No. 98–570, Part I, Committee on Education and Labor, *reprinted in* 1984 U.S.Code Cong. & Ad.News, 98th Cong., 2d Sess., at 2738–39 (hereinafter 1984 U.S.Code Cong. & Ad. News). Similarly, in the section-by-section analysis of the Act, the Report refers to compensating employees whose "injuries occur[ ] on the navigable waters." *Id.* at 2759.

The 1972 amendments to the Act extended coverage to shoreside areas. Congress did not directly address the Act's seaward reach, but the history cannot fairly be read to support the view that the Act stops at the three-mile line. Indeed, in explaining the 1972 amendments, the House Report noted only that "coverage of the present [i.e., pre-1972] Act stops at the water's edge.... The result is a disparity in benefits payable ... for the same type of injury depending on which side of the water's edge ... the accident occurs." House Report No. 92–1441, Committee on Education and Labor, *reprinted in*, 1972 U.S.Code Cong. & Ad.News, 92nd Cong., 2d Sess., at 4707 (hereinafter 1972 U.S.Code Cong. & Ad.News). A primary purpose of the 1972 amendments was to eradicate the inequity of a scheme where longshoremen could walk in and out of coverage (*see infra* III C).

As the early Supreme Court cases make clear, the phrase "navigable waters of the United States" often includes the high seas. Had Congress intended to define navigable waters more narrowly for purposes of the LHWCA, it could have chosen the term territorial waters, *see, e.g.*, 1 *Benedict on Admiralty* § 141 (7th ed.), or it could have explicitly indicated that navigable waters of the United States exclude the high seas. There is no indication of such a limitation in the legislative history. On the contrary, Congress passed the LHWCA under the constitutional grant of admiralty jurisdiction. *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *see also* Gilmore & Black, *The Law of Admiralty* §§ 6–47, 6–48, 6–49 (2d ed. 1975). In the context of admiralty jurisdiction, the phrase "navigable waters of the United States" has been used in contradistinction to navigable *State* waters, not in contrast to the high seas. *See, e.g., The Montello*, 78 U.S. at 415; *The Daniel Ball*, 77 U.S. at 563; *see also* 1 *Benedict on Admiralty* § 141, at 9–2, 9–37 (7th ed.). Furthermore, Congress attempted with the passage of the original LHWCA to preserve the applicability of state law workers' compensation remedies. *See* Gilmore & Black, *The Law of Admiralty* §§ 6–46, 6–49. This effort failed, but the effort itself buttresses the conclusion that the phrase "navigable waters of the United States" in the LHWCA embodies the same distinction which it does in admiralty generally: the distinction between State waters and waters of the United States, not between territorial waters and the high seas.

On review of *Cove Tankers I*, the Second Circuit, in an opinion by Chief Judge Feinberg, affirmed the judgment, holding that, regardless of whether "navigable waters of the United States" *always* include the high seas within the meaning of the LHWCA, the Act *can* consistently be applied to longshoremen injured on the high seas. *Cove Tankers Corp. v. United Ship Repair, Inc.*, 683 F.2d 38, 41 (2d Cir.1982) (*Cove Tankers II* ). Focusing on the facts of the case before it, involving an employee performing ship repair duties aboard a vessel

bound for New York from Philadelphia, the Second Circuit observed that declining to apply the Act to an injury occurring 135 miles offshore "would be inconsistent with congressional intent to reduce the importance of situs as applied to employees who might otherwise be covered for only a part of their work." 683 F.2d at 42. The argument offered to this court by Reynolds seems similar to that which was urged before the Second Circuit in *Cove Tankers II.* We therefore quote the core of that court's cogent response:

> Were we to follow the reasoning urged upon us by [Reynolds], that the Act can never apply to waters farther than three miles offshore, the voyage in this case would have moved the employees in and out of coverage. Indeed, under that reasoning, shipowners could by mere course deviation into waters beyond that limit, prevent employees, should they be injured, from receiving the Act's benefits.... It is true that congressional focus in 1972 was landward, not seaward. But, paraphrasing the Supreme Court, we do not think that Congress intended the Act's coverage to shift with the shipowner's whim. [*Pfeiffer v. Ford,* 444 U.S. 69, 83, 100 S.Ct. 328, 337, 62 L.Ed.2d 225 (1979).]

683 F.2d at 42.[8]

### C. *Policy Considerations.*

The Second Circuit's opinion in *Cove Tankers II* repeats a persistent theme of judicial opinions construing the post-1972 version of the LHWCA, namely: that Congress' general intent in enacting the 1972

amendments was to *broaden* the Act's coverage, to insure that workers not cease to be covered by the mere fortuity of crossing a line. *See, e.g., Director OWCP v. Perini North River Associates,* 459 U.S. 297, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983). Given the diminution in significance of the line between land and sea from the standpoint of LHWCA coverage, it would be odd indeed to conclude that the line between territorial waters and the high seas marks the outer boundary of the LHWCA. Neither the language of the Act nor the considerations underlying the Act lend support to the notion that the three-mile line is the on-off switch for the LHWCA.

In *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977), Justice Marshall observed for a unanimous Court that in enacting the 1972 amendments, Congress aimed at creating a system which does "not depend on the 'fortuitous circumstance of whether the injury ... occurred on land or over water.'" 432 U.S. at 272, 97 S.Ct. at 2361 (quoting report of Senate Committee on Labor and Public Welfare, No. 92–1125, at 13 [hereinafter S.Rep. (1972)]; Report of the House Committee on Education and Labor, No. 92–1441, at 10 [hereinafter H.Rep. (1972)]). In addition, "[t]he language of the 1972 Amendments is broad and suggests that we should take an expansive view of the extended coverage. Indeed, such a construction is appropriate for this remedial legislation." *Caputo,* 432 U.S. at 268, 97 S.Ct. at 2359.

---

**8.** A factual distinction between Reynolds and the longshoreman in *Cove Tankers* merits mention. Reynolds was not, while aboard the Ticonderoga, performing his usual duties. However, he was still employed as a shipfitter for Litton, and Litton took the Ticonderoga out on sea trials pursuant to its construction contract. Reynolds' status as a worker who is covered under the Act has never been an issue in this case. And though he was not doing his usual job at the time he was injured, other courts have noted that a worker does not cease to be covered by the Act merely because at the moment of injury he is not performing his usual duties. *See, e.g., Brady-Hamilton Stevedore Co. v. Herron,* 568 F.2d 137, 140 (9th Cir.1978); *Stockman*

*v. John T. Clark & Son of Boston,* 539 F.2d 264, 274 (1st Cir.1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1092 (1977). This conclusion is firmly supported by the 1984 amendments' legislative history, which states:

> The Committee firmly believes that the situation in which a worker may be covered at one time, and not covered at another, depending on the nature of the work which the worker is performing at the time of injury must be avoided since such a result would be enormously destabilizing, and would thus defeat one of the essential purposes of these amendments.

1984 U.S.Code Cong. & Ad.News, at 2736–37.

The failure of the Act to state explicitly that longshoremen who happen to be on the high seas continue to be covered by the Act is surely related to the infrequency of longshoremens' happening upon the high seas. In fact, the legislative history accompanying formative congressional efforts to permit states to extend their workmens' compensation schemes beyond their shores confirms this conclusion:

> The longshoremen are no more peripatetic workmen than are the repair men. They do not leave the port in which they work; they do not go into different jurisdictions. They are part of the local labor force and are permanently subject to the same conditions as other local workmen.

H.Rep. No. 639, 67th Cong., 2d Sess., at 2 (1922) (quoted in *Caputo*, 432 U.S. at 257 n. 12, 97 S.Ct. at 2354 n. 12). As Reynolds has demonstrated, longshoremen may on occasion have their jobs carry them to sea. That this happens rarely does not mean that when it does, longshoremen lose their protection.

In *P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979), Justice Powell pointed out for a unanimous Court that the legislative history pertaining to the 1972 amendments "discusses workers solely in terms of what they are doing and never in terms of where they are working." 444 U.S. at 80, 100 S.Ct. at 336; *see also* 444 U.S. at 78 n. 8, 83, 100 S.Ct. at 335 n. 8, 337. Nevertheless, the Court has repeatedly recognized that the Act must be interpreted liberally, to effectuate Congress' intention that longshoremen who meet the status requirement for coverage continue to be covered regardless of their precise location at the moment of injury. *See, e.g., Perini*, 459 U.S. at 315–16, 103 S.Ct. at 646–47.

In *Texports Stevedore Co. v. Winchester*, 632 F.2d 504 (5th Cir.1980) (en banc), *cert. denied*, 452 U.S. 905, 101 S.Ct. 303, 69 L.Ed.2d 406 (1981), this court noted that neither the *Caputo* nor the *Pfeiffer* opinions "tangle[d] with the thornier problems of the new 'situs test'" contained in the post-1972 Act. 632 F.2d at 510. We then observed, although the case at hand involved landward extension of the Act, that the Act's situs requirement is not amenable to definition by the use of fixed lines. "All circumstances must be examined." 632 F.2d at 514. Obviously, "[t]he site must have some nexus with the waterfront," but reliance on "hard lines ... would frustrate the congressional objectives of providing uniform benefits." 632 F.2d at 514–15. We also explained in *Winchester* that under binding Supreme Court and Fifth Circuit authority, "[t]he Act should be liberally construed in favor of injured workers, 'in conformance with its purpose, and in a way that avoids harsh and incongruous results.'" 632 F.2d at 515 (quoting *Voris v. Eikel*, 346 U.S. 328, 333, 74 S.Ct. 88, 92, 98 L.Ed. 5 (1953)). We continued: "A broad interpretation of the maritime situs requirement reduces the number of workers walking in and out of coverage and promotes uniformity." 632 F.2d at 516. To hold in this case that the three-mile line constitutes the outer boundary of the LHWCA would be to introduce hard lines and to create a statute which builders testing their ships could easily and purposefully sail beyond.

## IV. EXCLUSIVITY OF THE LHWCA.

Reynolds maintains that even if he is covered under the LHWCA, he may sue Litton for negligence under § 905(b). Reynolds relies upon the first sentence of the statute which provides as follows:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person ... may bring an action against such vessel....

33 U.S.C. § 905(b). In addition to the sentence which forms the basis of Reynolds' claim, however, the statute also contains an additional sentence which is largely overlooked by both sides in this appeal. That sentence provided: [9]

---

**9.** In 1984, § 905(b) was amended, and the sentence quoted in the text now reads as follows:

If such person was employed by the vessel to provide shipbuilding or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing shipbuilding or repair services to the vessel.

33 U.S.C. § 905(b) (1972). We conclude that while the Ticonderoga was at sea for sea trials, Litton was still engaged in shipbuilding; consequently, Reynolds may not sue under § 905(b).

At the time Reynolds was injured, Litton was performing ship building services. Our opinion in *Williams* makes clear that a shipbuilder takes a ship out for sea trials to determine whether the ship is "completed, fit and seaworthy." 452 F.2d at 957. "The whole purpose of the sea trial was to ascertain what additional work would be required to make the [Ticonderoga] fully fit." 452 F.2d at 957. Although some two-thirds of the approximately 500 persons aboard the Ticonderoga were Litton employees (with the remainder being Navy personnel), Litton was not operating the ship in commerce; it could not use the ship for its own benefit. Litton was testing the Ticonderoga as required by its construction contract with the Navy.

The definition of vessel was added to the LHWCA by the 1972 amendments. The legislative history accompanying the amendment of that section is brief, but the 1972 legislative history pertaining to § 905(b) does explain that "if the [injured] employee were employed by the vessel to provide shipbuilding or repair services and his injury were caused by the negligence of other persons providing such services to the vessel, such a[ ] [negligence] action

against the vessel would be barred." 1972 U.S.Code Cong. & Ad.News, at 4719. It is therefore clear that even before the 1984 amendments, the type of action Reynolds is seeking to bring against Litton was barred by the 1972 version of the Act. Further, the pertinent legislative history prior to the 1984 amendments explains that "the [1972] bill provides in the case of a longshoreman who is employed directly by the vessel there will be no action for damages if the injury was caused by the negligence of persons engaged in performing longshoring services. Similar provisions are applicable to ship building or repair employees employed directly by the vessel." 1972 U.S.Code Cong. & Ad.News, at 4705.

Reynolds' employer, Litton, was engaged in shipbuilding services. Litton's duties as "operator" were highly circumscribed, specifically defined, and merely incidental to its contractual obligation to build a ship. *Cf. Ducote v. International Operating Co.*, 678 F.2d 543, 546 (5th Cir.1982) (party cleaning and loading a barge not an owner pro hac vice because it "did not have the right to use the barge for its own purposes in maritime commerce").[10] Reynolds, moreover, worked for Litton as a shipfitter. His brief voyage on the Ticonderoga was a voluntary sojourn which occurred while Litton was still in the process of building the ship. Reynolds is clearly barred from bringing an action under § 905(b).

## V. CONCLUSION.

In summary, we hold that (1) Reynolds was not a Jones Act seaman; (2) he continued to be covered by the LHWCA even

---

If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer. 33 U.S.C. § 905(b). This provision, as amended, applies only to injuries sustained after September 28, 1984; Reynolds was injured well before that date.

**10.** This analysis is consistent with the Supreme Court's reasoning in *Reed v. The Yaka*, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963), where the Court explained that a bare boat charterer or owner pro hac vice is treated as a vessel owner under the statute because the charterer or owner pro hac vice has "full possession and control of the vessel"; the ship "makes his voyages and carries the cargo he chooses"; and he receives the primary benefit of "[s]ervices performed onboard the ship." 373 U.S. at 412, 83 S.Ct. at 1352.

though he sustained his injury while the Ticonderoga was beyond territorial waters; and (3) he may not sue under § 905(b) because Litton was engaged in shipbuilding activity. Accordingly, the judgment of the district court is AFFIRMED.