**George MINK, individually, for Use and Benefit of Insurance Company of North America, Plaintiff–Appellant,**

v.

**GENMAR INDUSTRIES, INC., etc.,
Defendant–Third–Party
Plaintiff–Appellee,**

v.

**Joseph Riddick HENDRICK, III, J.R.H. Racing, Inc., d/b/a Hendrick Motor Sport, Hendrick Motor Sport, Third–Party Plaintiffs–Appellees.**

No. 92–3100.

United States Court of Appeals,
Eleventh Circuit.

Aug. 30, 1994.

**1544**

Susan K. Burkhart, David Batten, Cranfill, Sumner & Hartzog, Raleigh, NC, for Mink.

F. Steven Herb, Robert Cyril Widman, Nelson, Hesse, Cyril, Smith, Widman, Herb, Causey & Dooley, Sarasota, FL, for Genmar Industries, Inc.

Carl R. Nelson, Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, FL, for 3rd party plaintiffs.

Before ANDERSON and BIRCH, Circuit Judges, and ATKINS*, Senior District Judge.

ANDERSON, Circuit Judge:

## I. INTRODUCTION

In this case, we address whether maritime law applies to an action arising out of injuries sustained by a passenger of a pleasure craft.

---

\* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. In light of our disposition, we need not reach the question of whether the oral agreement constituted a lease or a sale or a joint venture.

## II. FACTS

On November 28, 1986, appellant George Mink was injured while riding as a passenger on board a Wellcraft Scarab, a 38-foot pleasure craft that was being operated at a high rate of speed on the navigable waters of the United States in the Gulf of Mexico off of Sarasota, Florida. As a result of the accident, Mink suffered serious personal injuries.

There was an oral agreement[1] entered into between Genmar Industries ("Genmar") and an entity associated with Joseph R. Hendrick, J.R.H. Racing, Inc., Hendrick Motor Sports, or Hendrick Management Corporation ("Hendrick"),[2] pursuant to which a Wellcraft vessel built by Genmar would be provided in consideration of being displayed at car dealerships and at automotive races as a form of advertising for Genmar. The boat was painted to match the color and design of Hendrick's racing automobiles.

Hendrick travelled to Florida with his family to inspect the Scarab. Hendrick instructed Mink to drive a specially modified truck from Charlotte to Sarasota which would be used to take the Scarab back to Charlotte upon its delivery. Upon the group's arrival, Genmar's agent, Pruitt, provided instructions and demonstrations to Hendrick. The Scarab was taken to a Hyatt hotel/marina in Longboat Key where Hendrick's family and his companions were staying. Mink, together with his daughter, accompanied Pruitt, Hendrick, Hendrick's daughter, and Chuck Mack, the boat's paint designer, on a ride in the boat.

As the Scarab cruised through the Gulf of Mexico at approximately 80 miles per hour, Pruitt demonstrated to Hendrick the operation of the engines and the boat's trim. Mink, who had never been on a boat before, had difficulty locating a secure position on the boat. The boat had two seats with a

---

2. Because of our disposition of the case, we need not reach the question of the precise identity of the Hendrick entity which entered into the agreement with Genmar; nor need we decide which one employed appellant Mink. Accordingly, we refer to all of the Hendrick entities generically as "Hendrick" for purposes of this discussion.

semicircular shape designed to protect the driver and one passenger beside the driver. Mink had stood behind Pruitt and Hendrick, holding onto the cushioned back of one of those seats. There was no handrail which Mink could have used from this position. Mink, in attempting to find a secure position for himself and the two minor girls, could not maintain his balance and was slammed to the deck of the boat. He hit the deck of the Scarab with such force that he crushed a vertebrae, rendering him a paraplegic.

Almost four years later, on November 30, 1990, Mink filed an action in a Florida circuit court against Genmar, the manufacturer of the powerboat. On January 17, 1991, Genmar filed a notice of removal based upon diversity. Genmar subsequently filed for dismissal and filed a third-party complaint against Joseph R. Hendrick and Hendrick Motor Sports ("Hendrick"), seeking indemnity or contribution. In his amended complaint filed March 19, 1991, Mink brought claims of negligent design and manufacture, negligent operation, products liability, and breach of implied warranty. He requested a jury trial. Specifically, Mink alleges that Genmar failed to provide adequate handholds or seats for passengers or other sufficient protection for the passengers.

The district court granted Genmar's motion to dismiss the amended complaint and entered judgment on September 21, 1992, dismissing the case as time-barred by the

three year maritime statute of limitations, 46 U.S.C. app. § 763a. The issue before us is whether Mink's suit falls within the scope of the substantive maritime law or falls outside of it so that state law remains competent to provide a remedy. For the reasons that follow, we conclude Mink's suit falls within the scope of the substantive maritime law. Thus, we affirm.

## III. DISCUSSION

### A. *Maritime Jurisdiction*

■ As noted, the injury to Mink occurred while a vessel was being navigated on navigable waters. We readily conclude that the instant case falls well within the admiralty jurisdiction. This case satisfies both the traditional locality test for determining admiralty jurisdiction, and also the more recently articulated maritime nexus test, i.e., that the wrong must bear a significant relationship to traditional maritime activity. *See Sea Vessel, Inc. v. Reyes,* 23 F.3d 345 (11th Cir.1994). The common formulation of the locality test was articulated by the Supreme Court in *The Plymouth,* 70 U.S. (3 Wall.) 20, 36, 18 L.Ed. 125 (1866): "Every species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance." Thus, to satisfy this test, a tort need occur only on navigable waters, which clearly occurred in this case.[3]

---

**3.** At the outset, Mink contends that the "situs" requirement is not satisfied here because the Scarab was not a "completed vessel" and thus could not have been "in navigation" for purposes of determining whether a maritime tort occurred. Mink apparently argues that the absence of a cockpit cover rendered the vessel incomplete, thus transforming the apparent pleasure ride into some type of sea trial. This argument is without merit. Mink relies upon the Fifth Circuit's decision in *Reynolds v. Ingalls Shipbuilding Division, Litton Systems, Inc.,* 788 F.2d 264 (5th Cir.1986). In *Reynolds,* the Fifth Circuit held that a shipfitter injured during sea trials could not evade the exclusivity of the remedy afforded him under the Longshore and Harbor Worker's Compensation Act by resort to 33 U.S.C. § 905(b). Section 905(b) provides that under some circumstances, employees injured by a vessel's negligence may bring suit against the vessel, but not against the employer. The LHWCA defines "vessel" liberally to include the operator of a vessel. 33 U.S.C. § 902(21). In

concluding that the injured shipfitter was barred from bringing suit against his employer pursuant to section 905(b), the court relied upon legislative history specific to section 905(b) of the LHWCA. 788 F.2d at 273. From an examination of the legislation, the court determined that Congress unambiguously precluded an injured employee from bringing suit where the suit arose from the negligence of persons engaged in ship building services. *Id.* The reliance upon the specific language of the LHWCA and its unambiguous legislative history indicates that the decision is inapposite to the instant case. Mink has not invoked the protections of the LHWCA in this case and thus has not sought to evade the limitations of liability provided by that Act. We accordingly decline to apply *Reynolds* in this context.

No case located suggests that the "completed vessel" analysis is appropriate to the facts of this case. Rather, that theory has been utilized only in determining when the land-based activity of

Turning to the maritime nexus inquiry, we readily conclude that this case has a maritime nexus. We must determine whether the "'potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime activity.'" *Sisson v. Ruby,* 497 U.S. 358, 362, 110 S.Ct. 2892, 2995–96, 111 L.Ed.2d 292 (1990) (quoting *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 675 n. 5, 102 S.Ct. 2654, 2658 n. 5, 73 L.Ed.2d 300 (1982)). This case clearly poses a potential hazard to maritime commerce. In undertaking this inquiry, we "must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." *Sisson, id.,* 497 U.S. at 363, 110 S.Ct. at 2896. Mink argues that in the instant case there was no *actual* disruption of maritime commerce. However, as noted in *Sisson,* "[t]he jurisdictional inquiry does not turn on the *actual* effects on maritime commerce" nor upon "the particular facts of the incident in th[e] case." *Id.; Sea Vessel, Inc. v. Reyes,* 23 F.3d at 350 and n. 8. Rather, eschewing a fact specific inquiry, the law requires that we examine the "general features" of this type of incident. In this case, the appropriate characterization is no more specific than injury to a passenger in proximity to the operator on a vessel during navigation in navigable waters.[4] Thus, although there was no *actual* disruption of maritime commerce in the instant case, there clearly was a potential disruption. Mink could have fallen forward, striking the pilot or controls, thus directly interfering with the navigation of the craft and potentially caus-

ing an accident with another craft. Or, the disruption of a serious passenger injury within such intimate confines could have distracted the pilot and indirectly interfered with the navigation of a vessel. We readily conclude that there was a potential hazard to maritime commerce.

We also conclude that the potential hazard to maritime commerce "arises out of activity that bears a substantial relationship to traditional maritime activity." As indicated above, and focusing as we must on the general nature of the activity, the relevant activity is the navigation of a vessel on navigable waters.[5] Obviously, this is the very paradigm of traditional maritime activity. *Sisson,* 497 U.S. at 368, 110 S.Ct. at 2899 (Scalia, J. concurring).

Mink argues that neither the locality test nor the nexus test is satisfied because the alleged design defect, e.g., failure to include handrails, occurred upon land. Both logic and precedent compel rejection of Mink's argument. The defect could not have manifested itself, and the injury could not have occurred until the vessel was actually operated as a vessel in navigation. Thus, logically, the tort is a maritime tort. Moreover, precedent overwhelmingly indicates this result. The Supreme Court so held in *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). There, a defective part was installed in a vessel causing injury while the vessel was sailing on the high seas. The court concluded that such a case would clear-

---

ship building acquires a sufficient "maritime flavor" to fall within the admiralty jurisdiction. In particular, the determination of the status of a vessel has been important to *in rem* actions where federal jurisdiction is exclusive. Absent applicability of a specific legislative scheme, the general definition of vessel applies. Pursuant to 1 U.S.C. § 3, "'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. This definition is consonant with the meaning attributed to the term "vessel" by the general maritime law. 1 *Benedict on Admiralty* § 165 at 10–13 (7th ed. revised 1994). Where a vessel has been used as a means of transportation, as in this case, we decline to engraft upon the general language of the statute a "completed vessel" requirement.

4. We need not decide in this case whether an even more general characterization is appropriate. In *Foremost,* 457 U.S. at 675, 102 S.Ct. at 2658, which involved the collision of two pleasure boats on navigable waters, the relevant activity was navigation of vessels generally. *Sisson,* 497 U.S. at 364, 110 S.Ct. at 2897. In *Sisson,* the relevant activity was the storage and maintenance of a vessel at a marina on navigable waters. *Id.*

5. *Sisson,* 497 U.S. at 362–66, 110 S.Ct. at 2896–97, and *Foremost,* 457 U.S. at 675, 102 S.Ct. at 2658, foreclose any argument by Mink that the case falls outside the admiralty jurisdiction because the vessel was not itself a commercial vessel or that the accident occurred at a particular point within the navigable waters not then being used by commercial interests.

ly fall within the admiralty jurisdiction, and that products liability of that type was part of the general maritime law. 476 U.S. at 863–65, 106 S.Ct. at 2298–99.[6] Numerous cases from our sister circuit courts of appeal have also held that products liability actions involving pleasure craft in navigation fall within the admiralty jurisdiction. *See Hassinger v. Tideland Electric Membership Corp.*, 781 F.2d 1022 (4th Cir.), *cert. denied*, 478 U.S. 1004, 106 S.Ct. 3294, 92 L.Ed.2d 709 (1986) (defective mast); *Sperry Rand Corp. v. Radio Corp.*, 618 F.2d 319 (5th Cir.1980) (defective steering gyro); *Jones v. Bender Welding & Mach. Works*, 581 F.2d 1331 (9th Cir.1978) (defective design caused damage to fishing vessel); *Jig The Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171 (5th Cir.1975), *cert. denied*, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976) (negligent design of shrimp boat); *Richards v. Blake Builders Supply, Inc.*, 528 F.2d 745 (4th Cir.1975) (explosion on pleasure craft); *Anderson v. Whittaker Corp.*, 692 F.Supp. 764 (W.D.Mich.1988), *aff'd in part and rev'd in part on other grounds*, 894 F.2d 804 (6th Cir.1990) (products liability suit where pleasure craft sank).

### B. *Substantive Admiralty Law*

■■■ Having determined that this case easily meets both the traditional locality test and the maritime nexus test and thus falls comfortably within the admiralty jurisdiction, it follows that substantive admiralty law applies. *East River*, 476 U.S. at 862–66, 106 S.Ct. at 2298–99; *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 254, 93 S.Ct. 493, 498, 34 L.Ed.2d 454 (1972); *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 360, 79 S.Ct. 468, 473, 3 L.Ed.2d 368 (1959); *Wahlstrom v. Kawasaki*

*Heavy Industries, Ltd.*, 4 F.3d 1084, 1086 (2d Cir.1993). Accordingly, the three-year statute of limitations for maritime torts, prescribed in 46 U.S.C. app. § 763a, applies.[7] In *Butler v. American Trawler Co., Inc.*, 887 F.2d 20 (1st Cir.1989), the First Circuit held that the three-year statute of limitations applies to maritime torts. The court expressly rejected an argument, similar to the one Mink presents, that a different state statute of limitations should apply. In enacting § 763a, Congress intended to provide a uniform statute of limitations for all maritime personal injury and death torts. *Butler*, 887 F.2d at 22; *Friel v. Cessna Aircraft Co.*, 751 F.2d 1037, 1038–39 (9th Cir.1985). As discussed below, this is consistent with the well established law recognizing the need for uniformity with respect to maritime standards.

In an artful attempt to recast his maritime tort claims as a contract claim in order to evade the less favorable statute of limitations afforded under the maritime law, Mink argues that his claim can be viewed as stating a cause of action for the same personal injuries under the Florida law of implied warranty. In other words, Mink argues that he has side-by-side claims for the same personal injuries both in tort and in contract. Although it is not at all clear that Mink could prevail under the Florida law of implied warranty, we need not reach the state law issues because we readily conclude that this case is governed by the substantive admiralty law. As noted above, 46 U.S.C. app. § 763a, and its legislative history, clearly evidence a Congressional intent to establish a uniform statute of limitations, consistent with the well-established case law recognizing the need for uniformity with respect to maritime standards. As noted by the First Circuit in

---

**6.** The court also concluded that mere injury to the ship itself, or pure economic loss, presented a claim in the nature of a warranty action, and thus was not within the admiralty jurisdiction.

**7.** Section 763a represents the codification of Public Law 96–382 which provides in pertinent part:

    Statute of Limitations—Maritime Torts

An act to provide for a uniform national three-year statute of limitations in actions to recover damages for personal injury or death, arising out of a maritime tort, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That, unless otherwise specified by law, a suit for recovery of damages for personal injury or death, or both, arising out of a maritime tort, shall not be maintained unless commenced within three years from the date the cause of action accrued.

Pub.L. No. 96–382, 94 Stat. 1525 (1980) (codified 46 U.S.C. app. § 763a (Supp.1993)).

*Butler, supra,* in passing § 763a, "Congress intended that statute to preclude the operation of different state limitations statutes in respect to maritime torts." 887 F.2d at 21. The reasoning of the First Circuit, with which we agree, is based both upon the language of the statute and its legislative history:

> The language and legislative history of the subsequently enacted federal statute [§ 763a] contain nothing suggesting Congress intended to permit states to apply their own, differing statutes of limitations instead. To the contrary, the language of the statute suggests that Congress enacted it to deal with the problem of non-uniformity, a problem that arose because courts, applying the federal doctrine of laches, would "use [differing] local limitation statutes as a rule-of-thumb."

887 F.2d at 22 (quoting *Oroz v. American President Lines,* 259 F.2d 636, 639 (2nd Cir. 1958)).

The recognition of the fundamental need for uniformity with respect to maritime standards is of long-standing vintage. It was articulated by Justice Bradley in *The Lottawanna* and reiterated in *Southern Pacific Co. v. Jensen:*

> 'One thing however, is unquestionable; the Constitution must have referred to a system of law coextensive with, and operating uniformly in, the whole country. It certainly could not have been the intention to place rules and limits of maritime law under the disposal and regulation of the several states, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the states with each other or with foreign states.'

*Jensen,* 244 U.S. 205, 215, 37 S.Ct. 524, 528–29, 61 L.Ed. 1086 (1917) (quoting *The Lottawanna,* 88 U.S. (21 Wall.) 558, 575, 22 L.Ed. 654 (1875)). It follows logically as part and parcel of the need for uniformity that, once it is determined that the case involves a maritime tort, the case is governed by the substantive admiralty law. Courts have uniformly so held. *East River,* 476 U.S. at 862–66, 106 S.Ct. at 2298–99; *Executive Jet,* 409

U.S. at 254, 93 S.Ct. at 498. As early as 1917, the Supreme Court held:

> Equally well established is the rule that state statutes may not contravene an applicable act of Congress or affect the general maritime law beyond certain limits ... And plainly, we think no such legislation is valid if it contravenes the essential purpose expressed by an act of Congress, or works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations. This limitation, at the least, is essential to the effective operation of the fundamental purposes for which such law was incorporated into our national laws by the Constitution itself.

*Jensen,* 244 U.S. at 216, 37 S.Ct. at 529.

Indeed, the federal interest in uniformity is such that the courts have developed a reverse-Erie doctrine, by virtue of which the same federal maritime law applies in maritime cases, whether the case is brought in state court or in federal court based on diversity of jurisdiction. In *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953), the Supreme Court, noting that a state court would be required to apply the substantive admiralty law in maritime cases, held that the principle of equal justice embodied in the Erie–Tompkins doctrine would also indicate that a federal court diversity case involving a maritime tort must apply the substantive admiralty law. *See Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 222–23, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174 (1986) (although state courts are authorized to entertain maritime causes of action under some circumstances, "the extent to which state law may be used to remedy maritime injuries is constrained by a so-called 'reverse-Erie' doctrine which requires that substantive remedies afforded ... conform to governing federal maritime standards").

Mink's attempt to recast his maritime tort claim in the form of a state law contract claim must fail in the face of the clear Congressional mandate of § 763a that a uniform statute of limitations be applicable, and in the face of the well-recognized case law that the need for uniform maritime standards dictates

application of the federal maritime law. If Mink could merely recast his claim for personal injuries to fit a different state law cause of action and succeed in obtaining a different set of governing standards, the federal interest in uniformity would disintegrate.[8] Accordingly, we reject Mink's attempt to recast his maritime tort claim as a state law contract claim.[9]

## IV. CONCLUSION

For the foregoing reasons,[10] we hold that the instant case meets the appropriate tests and falls well within the admiralty jurisdiction. Thus, the substantive federal maritime law applies, including the uniform three-year statute of limitations set out in § 763a. Accordingly, the judgment of the district court is

AFFIRMED.

---

**8.** Mink has made no argument attempting to fit his case under any of the recognized situations which would permit the operation of state law. *See, e.g., Steelmet, Inc. v. Caribe Towing Corp.,* 779 F.2d 1485, 1489–91 (11th Cir.1986) (holding that a state may create a direct action against an insurance company in a maritime case because there was no conflict with the admiralty law and no strong admiralty interest affected by the state statute, including no strong concern for uniformity with respect thereto, and on the other hand, a strong state interest in the regulation of insurance). To the contrary, Mink invites us to apply a different and conflicting state statute of limitations to the same claim for personal injuries that we have already determined to constitute a maritime tort. This we decline to do.

**9.** In *East River, supra,* the Supreme Court, articulating substantive admiralty law, held that a manufacturer would have no tort liability in a products liability case where the injury was only to the product itself. Such a case, the Supreme

Court said, would most naturally be understood as a warranty claim, and should be governed by the contract for which the parties bargained and the contract law. While the Supreme Court in *East River* did not address the precise issue before us—i.e., whether in a products liability case for personal injuries, a breach of warranty claim could exist side-by-side with the maritime tort— the Supreme Court did hold that such a products liability case for personal injuries was a maritime tort within the substantive admiralty law. Moreover, our holding today that the maritime tort in the instant case is governed by the substantive admiralty law, and not by a different and conflicting state law, is entirely consistent with *East River,* is probably implicit in that opinion, and in any event is mandated by well-established and long-recognized precedent.

**10.** For the same reasons, the other arguments asserted by Mink on appeal are without merit and warrant no further discussion.