**Helen Ehret BACH, Eugene G. Bach, III, Janet B. Lashley, Plaintiffs–Appellants,**

v.

**TRIDENT STEAMSHIP COMPANY, INC., et al., Defendants–Appellees.**

No. 89–3298.

United States Court of Appeals, Fifth Circuit.

Jan. 10, 1991.

Mark W. Smith, Gregory F. Gambel, New Orleans, La., for plaintiffs-appellants.

O'Neill, Eichen, Miller & Breckinridge, and Robert H. Murphy, Kenneth J. Servay, Thomas D. Forbes, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendants-appellees.

Before BROWN, JOLLY and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

The survivors of Eugene G. Bach, Jr. appeal the summary judgment dismissal of their claims made under the Jones Act, the Longshore and Harbor Workers' Compensation Act, and the general maritime law. 708 F.Supp. 776 (E.D.La.1989). We affirm.

## I. FACTS

On December 26, 1986, Eugene G. Bach, Jr. came aboard the M/V JAYMAT TRIDENT to serve as its compulsory river pilot between New Orleans and Pilottown, near the mouth of the Mississippi River. Bach arrived alongside the M/V JAYMAT TRIDENT in a small pilot boat and ascended a pilot ladder to the ship's deck. Although Bach arrived safely on the bridge, he collapsed from a heart attack a few minutes later. The crew summoned medical help from shore, but no one attempted to aid

Bach although several had been trained in cardio-pulmonary resuscitation techniques.

Bach's survivors brought suit under the Jones Act, the Longshore and Harbor Workers' Compensation Act, and the general maritime law. All of their theories centered upon the adequacy of the pilot ladder and the failure of the crew of the vessel to render medical aid to Bach. The trial judge dismissed their claims, and this appeal followed.

## II. JONES ACT

■ Only a "seaman" may assert a negligence action under the Jones Act. 46 U.S.C.App. § 688.[1] An injured worker attains seaman status by proving: (i) permanent attachment to or substantial work on a vessel or an identifiable fleet of vessels; and (ii) contribution to the function or mission of the vessel or an identifiable fleet of vessels. *Barrett v. Chevron U.S.A., Inc.*, 781 F.2d 1067, 1072–74 (5th Cir.1986) (en banc); *Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir.1959).

■ Bach's survivors do not seriously argue that he was permanently attached to or did substantial work on board the M/V JAYMAT TRIDENT. The record clearly reveals that he fulfilled neither requirement. His transitory work aboard the M/V JAYMAT TRIDENT, which lacked any degree of regularity and continuity, does not constitute either permanent attachment to or substantial work aboard that vessel. See *Barrett*, 781 F.2d at 1073–74.

Bach's survivors argue that he is not required to establish a connection to the M/V JAYMAT TRIDENT because he can prove the requisite connection to a "fleet" of vessels that includes the M/V JAYMAT TRIDENT. See *Barrett*, 781 F.2d at 1074; *Braniff v. Jackson Ave.—Gretna Ferry, Inc.*, 280 F.2d 523 (5th Cir.1960). In *Barrett*, we defined "fleet" for these purposes as an "identifiable group of vessels acting together or under one control." *Barrett*, 781 F.2d at 1074. The only apparent con-

nection between the vessels Bach piloted was that they traversed a stretch of the Mississippi River between New Orleans and Pilottown. Ordinarily, this would hardly constitute a fleet. But Bach's survivors contend that because each vessel he worked aboard was under his control when he piloted it, the aggregation of the vessels he worked aboard constitutes a fleet.

We made it clear in *Barrett* that "fleet" means more than simply "any group of vessels an employee happens to work aboard." 781 F.2d at 1074. Bach's "control" argument is no more than an attempt to make a "fleet" out of all the vessels he worked aboard. *Barrett's* definition and explanation of "fleet" forecloses this argument. This group of vessels is not a "fleet."

■ While Bach fails the vessel connection prong of the *Robison–Barrett* test, we have specifically reserved decision on whether an exception to that test might be made in a case such as Bach's:

> We do not decide whether the same principle governs the crewmember status of the maritime worker who spends virtually all of his time performing traditional seaman's duties—work closely related to the movement of vessels—but does his work on short voyages aboard a large number of vessels.

*Barrett*, 781 F.2d at 1075 n. 13. The question we reserved in *Barrett* faces us today. In particular, we must decide whether to exempt workers who perform traditional seaman's work on a large number of unconnected vessels from the vessel connection prong of our test for seaman status.

Bach's case for seaman status has considerable intuitive appeal for two reasons: (i) his entire job was to perform an archetypical seaman function, the steering of an oceangoing vessel through navigable waters; and (ii) in performing his job, Bach regularly faced many of the hazards of life on the sea and the risks created by moving vessels through navigable waters. To use a metaphor frequently employed in describ-

---

**1.** Because we decide that Bach is not a seaman, we need not consider whether Trident Steam-

ship was his employer for purposes of the Jones Act.

ing the stuff that makes a seaman, Bach's occupation was quite "salty" indeed.

Although some of our seaman status cases discuss the perils of the sea that the worker faces, we have never held that seaman status is coextensive with exposure to seaman's risks. We have frequently refused to extend seaman's protections to workers exposed to a seaman's perils but who lacked the requisite connection to a vessel or identifiable fleet of vessels. See *Ardleigh v. Schlumberger Ltd.*, 832 F.2d 933, 934 (5th Cir.1987) (employee who worked offshore on thirty unconnected vessels denied seaman status); *Lirette v. N.L. Sperry Sun, Inc.*, 831 F.2d 554, 555–56 (5th Cir.1987) (worker who spent seventy-five to eighty percent of his working time aboard unconnected moveable drilling rigs not a seaman); *Langston v. Schlumberger Offshore Services, Inc.*, 809 F.2d 1192, 1194 (5th Cir.1987) (worker who performed work on fifteen vessels belonging to ten different owners not a seaman). We have also refused to extend seaman status to a variety of workers who undeniably faced the perils of the sea but who worked on a structure that did not qualify as a "vessel." See *Reynolds v. Ingalls Shipbuilding Div., Litton*, 788 F.2d 264, 267 (5th Cir.), *cert. denied*, 479 U.S. 885, 107 S.Ct. 278, 93 L.Ed.2d 253 (1986) (ship on sea trials not a vessel "in navigation," and therefore those working aboard ship during sea trials not seamen); *Reeves v. Offshore Logistics, Inc.*, 720 F.2d 835, 836–37 (5th Cir.1983) (helicopter not a vessel and therefore offshore helicopter pilot not a seaman).

Similarly, we have not granted seaman status to workers who performed the work usually or traditionally done by seamen but who lacked connection to a vessel or fleet of vessels. To the contrary, we have always required those workers performing traditional maritime functions to satisfy the vessel connection test. In *Fazio v. Lykes S.S. Co., Inc.*, 567 F.2d 301 (5th Cir.1978), we denied seaman status to a shoregang worker who performed traditional seaman's work but who lacked the requisite vessel connection. Similarly, in *White v. Valley Line Co.*, 736 F.2d 304 (5th Cir.1984), we refused to grant seaman status to an injured fleetman at a barge fleeting facility who spent almost all of his time aboard various barges doing seaman-type work—handling tow lines, and cleaning and repairing barges—but who could not show connection to a vessel or identifiable fleet of vessels. Thus, to grant Bach an exemption from establishing connection to a particular vessel or fleet of vessels would be inconsistent with a long list of cases from this court.

Granting Bach an exception to the vessel connection requirement would also draw us farther away from other circuits. Although *Robison* and *Barrett* only require the worker to establish that he aided in the accomplishment of the mission of the vessel, several other circuits adhere to the narrower "aid in navigation" test or a similarly stringent requirement. See *Stanfield v. Shellmaker, Inc.*, 869 F.2d 521, 523 (9th Cir.1989); *Johnson v. John F. Beasley Const. Co.*, 742 F.2d 1054, 1062–63 (7th Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1180, 84 L.Ed.2d 328 (1985); *Simko v. C & C Maintenance Co.*, 594 F.2d 960, 964–65 (3rd Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 64, 62 L.Ed.2d 42 (1979); *Whittington v. Sewer Const. Co.*, 541 F.2d 427, 436 (4th Cir.1976). To further weaken our test by excusing workers engaged in traditional maritime work from establishing vessel connection would only widen the gap between this court and most other circuits in the proof required to establish seaman status.[2]

Further, such an exception for workers engaged in traditional maritime work would be difficult to apply and would unnecessarily inject uncertainty and ambiguity in our circuit's test for seaman status. For example, would harborworkers, particularly those engaged in occupations

---

**2.** We note that the Supreme Court has granted certiorari in one of our Jones Act seaman cases, apparently to resolve this conflict among the circuits. See *Wilander v. McDermott Intern., Inc.*, 887 F.2d 88 (5th Cir.1989), *cert. granted in part*, —— U.S. ——, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990).

not enumerated in the Act[3] who perform essential vessel functions traditionally performed by the crew and who sometimes face seaman-type risks, be entitled to have a jury ponder whether they are seamen? For over thirty years, this circuit has struggled to provide a workable test for distinguishing seamen from other maritime workers in maritime injury cases. A large body of law, developed through a case-by-case application of the *Robison* test, provides the means for deciding which workers are entitled to the benefits of the Jones Act. Dozens (perhaps hundreds) of seaman status cases have come before us, but we have never made an exception to the core requirement that the injured worker show attachment to a vessel or identifiable fleet of vessels. We decline the invitation now to make a wholesale exception to a test that has served us for so long.

In short, to create an exception for a worker such as Bach who has the duties and faces the risks of a traditional seaman but who lacks requisite vessel connection would include all sorts of workers we have previously excluded, would widen the divergence of views between our circuit and others, and would make our seaman test unnecessarily uncertain and ambiguous. We therefore decline to make such a radical change in this circuit's test for Jones Act coverage. The district court correctly determined that no genuine issue of fact remained and that Bach was not a seaman as a matter of law.

## III. OTHER MARITIME REMEDIES

### A. *Section 905(b) of the LHWCA*

Bach's survivors also assert a negligence action against Trident Steamship under section 905(b) of the LWHCA. They make two arguments: (i) that the crew and owners of the M/V JAYMAT TRIDENT negligently provided a substandard boarding ladder; and (ii) that the crew of the TRIDENT were negligent in failing to administer cardio-pulmonary resuscitation (CPR) to him after his heart attack.

**3.** *See Pizzitolo v. Electro–Coal Transfer Corp.,* 812 F.2d 977 (5th Cir.1987), *cert. denied,* 484

### 1. Adequacy of the Boarding Ladder

■ Bach's survivors assert that the crew was negligent because it failed to provide him with an appropriate means of boarding the ship. They rely on two regulations concerning pilot ladders. The two regulations—one a part of the Safety of Life at Sea Convention (SOLAS) and a nearly identical Coast Guard regulation—require that when the distance from the water to the ship's deck exceeds thirty feet, "access from a pilot ladder to the [vessel or ship] must be by way of an accommodation ladder" or by an "equally safe and convenient means." Safety of Life at Sea Convention, 1974, Multilateral, Ch. 5, Regulation 17(a)(ii), 32 U.S.T. 47, 243, TIAS No. 9700, reprinted at 6B Benedict on Admiralty, doc. 14–8, at 14–400; 46 C.F.R. 96.40–1(g). The SOLAS regulation also requires a pilot ladder to be secured so that "the pilot can gain safe and convenient access to the ship after climbing ... not more than 9 metres (30 feet)."

Bach's survivors point out that the freeboard of the M/V JAYMAT TRIDENT was approximately thirty-two feet and that no accommodation ladder or similar device was provided for Bach's ascent. Therefore, they contend, both the SOLAS regulation and the Coast Guard regulation were violated.

We conclude that these regulations were not violated. The regulations do not prohibit pilot ladders more than thirty feet in length; nor do they prevent the use of a pilot ladder when the vessel's freeboard exceeds thirty feet. The obvious intention of these regulations is to limit to thirty feet the distance a pilot can be required to climb a pilot ladder. It is only after the pilot has climbed thirty feet of pilot ladder that an accommodation ladder or other similar device is required.

It is undisputed that Bach began his ascent of the pilot ladder at least eleven feet above the water level. Bach therefore

U.S. 1059, 108 S.Ct. 1013, 98 L.Ed.2d 978 (1988).

climbed considerably less than thirty feet on that ladder. Because Bach was required to climb less than thirty feet on the pilot ladder, no accommodation ladder or other device was required. Hence, Bach's section 905(b) claim based on violation of these regulations fails.

### 2. Failure of the crew to administer CPR

■ Bach's survivors also asserts a negligence claim based on the failure of the crew to administer CPR to him. Undisputed medical testimony indicates that Bach had no more than a fifteen percent chance of surviving even if the crew had rendered CPR and electrical defibrillation had been available. From this uncontradicted evidence, no rational factfinder could conclude that the crew's failure to administer CPR more likely than not caused Bach's death. See W. Keeton, Prosser and Keeton on Torts section 41, at 269 (5th Ed.1984) ("plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result"); Restatement (Second) by Torts sections 431, 433 comment b (1965).

Bach's survivors seek to avoid this factual weakness by urging this court to adopt a special rule of causation, the "loss of a chance of survival" doctrine. Under this doctrine, which as far as we can tell, has been confined to medical malpractice cases, plaintiffs who cannot meet the ordinary standards of causation are allowed to recover for negligent conduct that decreases their chances of survival. See generally Annotation, Medical Malpractice: "Loss of Chance Causality", 54 ALR 4th 10 (1987).[4]

We decline the invitation to apply this doctrine in this section 905(b) case, well beyond the context in which it has been developed.

Bach's survivors have therefore failed to prove causation and failed to persuade us to adopt the loss of a chance of survival doctrine. They therefore may not recover in negligence for the failure of the crew to administer CPR.

### B.  Unseaworthiness

■ Bach's survivors contend that they may bring an unseaworthiness action based on the "Sieracki" seaman doctrine. See Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). The Sieracki doctrine survives only in favor of maritime workers who are not covered by the LHWCA. See Aparicio v. Swan Lake, 643 F.2d 1109, 1118 (5th Cir.1981). However, the record before us does not clearly reveal whether Bach was an LHWCA-covered worker.[5] We therefore address their claim on the merits.

Unfortunately for Bach's survivors, this claim is nothing more than their negligence claim recast in terms of the warranty of seaworthiness. They assert that the vessel was unseaworthy because it did not have the type of ladder prescribed by SOLAS and Coast Guard regulations. As we have already noted, undisputed summary judgment evidence shows there was no violation. Hence, the unseaworthiness claim must fail as well.

AFFIRMED.

JOHN R. BROWN, Circuit Judge, dissenting:

Disregarding nearly a thousand years of maritime lore, enactments and codes of worldwide maritime nations, congressional enactments and Supreme Court decisions, the Court holds that a state compulsory pilot—the preeminent, indispensable member of the ship's company in controlling

---

**4.** Bach's survivors also rely on *Gardner v. National Bulk Carriers, Inc.,* 310 F.2d 284 (4th Cir.1962), *cert. denied,* 372 U.S. 913, 83 S.Ct. 728, 9 L.Ed.2d 721 (1963), in which the Fourth Circuit discussed the duty to attempt rescue of an overboard Jones Act seaman. We read *Gardner* as enforcing a special duty imposed by the Jones Act. Because Bach is not a Jones Act seaman, that special duty has no relevance.

**5.** The LHWCA covers those "engaged in maritime employment." 33 U.S.C. §§ 902(3), 903. The record does not clearly show that Bach was the employee of anyone. It is, therefore, unclear whether the LHWCA covered him.

and directing the immediate navigation of a vessel—is not a statutory Jones Act[1] seaman.

I cannot turn my back on this maritime tradition and compelling precedent. I am compelled to dissent.[2]

## I.

### The Pilot—A Hoary Figure

Dependent as the nation is, in large part, on the rich history and traditions of maritime law as it has been developed over the centuries amongst maritime nations in the aim generally for some universal, worldwide application, the maritime lore has exceeding importance.

Amongst the most ancient and venerable are the Rules of Oleron[3] to which the reknowned expositors of maritime law, ancient and contemporary, Gilmore and Black,[4] remind us that the rules have "always been regarded as having an especial importance for the maritime law of England, and hence for that of the United States.... [O]nce in a while, when more recent authority fails, a court may look back to them, and especially to the Rules of Oleron, for what analogical help may be vouchsafed."[5]

Although Gilmore and Black emphasize that "the most interesting of all these medieval maritime codifications ... is ... the Rules of Oleron,"[6] the Supreme Court did not confine itself so narrowly. In the really landmark case of *Cooley v. Board of Wardens*[7]—a case which resurrects vivid recollections in every lawyer, teacher, and judge as students of constitutional law— the Court had to determine and upheld the constitutionality of the Act of 7th of August 1789, § 4.[8]

The Court in what might have been frowned on by scholars, law review editors and those beholden to Blue and White books, referred specifically to

[n]umerous laws of this kind ... cited in the learned argument of the counsel for the defendant in error; and their fitness, as a part of a system of pilotage, in many places, may be inferred from their existence in so many different states and countries.[9]

---

**1.** 46 U.S.C.App. § 688:

Recovery for injury to or death of seaman (a) Application of railway employee statutes; jurisdiction

Any seaman who shall suffer personal injury in the course of his employment may ... maintain an action for damages ... with the right of trial by jury, and in such action ... [Federal Employers' Liability Act, 45 U.S.C. § 51 et seq., shall apply].

**2.** As set forth in part III I concur in the balance of the Court's opinion.

**3.** *See* Peters, Admiralty Decisions in the District Court of the United States for the Pennsylvania District (1807), Appendix to Vol. I, lxvii-xc (reprinted in 30 F.Cas. 1171). See also, GILMORE & BLACK, THE LAW OF ADMIRALTY, p. 7, n. 22 (2d Ed.1975) [hereafter G & B].

**4.** G & B, *supra* n. 3, at 6–7, nn. 20–22.

**5.** *Id.* at 7. *See also,* BENEDICT ON ADMIRALTY (7th Ed.1989) [hereafter BENEDICT], Laws of Oleron, § 6, p. 1–21, n. 1. BENEDICT summarizes Zouch's six-part general classification of the Rules of Oleron:

6. Touching the charge for hiring pilots, and their duty.

*Id.* at § 27, p. 2–6.

**6.** G & B, *supra* n. 3, at 6–7.

**7.** 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1852).

**8.** Quoted in 53 U.S. at 317, 13 L.Ed. at 1004:

"That all pilots in the bays, inlets, rivers, harbors, and ports of the United States, shall continue to be regulated in conformity with the existing laws of the States, respectively, wherein such pilots may be, or with such laws as the States may respectively hereafter enact for the purpose, until further legislative provision shall be made by Congress."

(Codified as amended at 46 U.S.C. § 8501(a).)

**9.** 53 U.S. at 312, 13 L.Ed. at 1002. As did the Supreme Court, I accept without further documentary authentication these ancient codes as listed in excerpts from counsel's briefs:

I. European. 1st Hanseatic Ordinances (about A.D. 1457), ch. 25. Captain to take pilot under penalty (amende) of one mark of gold. II. 486. 2d. Maritime Law of Sweden (about A.D. 1500). Captain to take a pilot, and if he neglects to do so, shall pay one hundred and fifty thalers, one third to the informer, one third to the sufferer (plaignans) or pilot offering, and one third to the poor mariners. Cap. 7, III. 172. 3d. Maritime Law of Du Pays Bas. Captain to take pilot, under penalty of fifty reals, and be responsible for any loss to the vessel. Cap. 24, tit. 9, IV, 83. 4th Maritime Law of France. Ordinances

## Laws of Oleron are Exacting as to Pilots

Whatever the authenticity of the author, Eleanor of Aquitaine, mother of Richard the Lionhearted, or the actions of Eleanor in the Holy Land,[10] Article XXIII is graphic, not only in the implication that a pilot must be aboard for voyages through localized waters, but in the seriousness of the pilot's occupation which holds him accountable for all of the consequences of his dereliction as pilot including, if his purse is not adequate, the loss of his head:

### Art. XXIII

If a pilot undertakes the conduct of a vessel, to bring her to St. Malo, or any other port and fail of his duty therein, so as the vessel miscarry by reason of his ignorance in what he undertook, and the merchants sustain damage thereby, he shall be obliged to make full satisfaction for the same, if he hath wherewithal; and if not, lose his head.[11]

> Louis XIV. A.D. 1681, ch. 26. If the mariners refuse a pilot, they shall suffer corporal punishment, and the one who tenders himself must be employed. And provides also for the examination of pilots by competent persons. IV. 395. Moreover, they who are engaged in navigating royal vessels into ports or rivers have not the option of taking or refusing a pilot; in the same case merchant vessels are required to take pilots, under the penalty of fifty livres, to be applied to the Marine Hospital, and the repairing of any damage from stranding. Art. 5, tit. 1, livre II. Ordinance of April, 1689; see Repertoire de Jurisprudence, tome 9, p. 236.
> 53 U.S. at 308, 13 L.Ed. at 1000.

**10.** G & B, *supra* n. 3, at 7, n. 23. Compare BENEDICT, *supra* n. 5, § 26 at 2–5 to 2–6, which states that the Rules of Oleron were: "... made by Richard the I [the Lionhearted], King of England, on his return from the Holy Land ... for the better regulation of *merchants, owners, and of ships, and mariners, and all seafaring persons in maritime affairs."*

**11.** Rules of Oleron, *supra* n. 3, 30 F. Cas. at 1180. Art. XXIV requires a pre-lethal protection to the errant pilot since the imminence of loss of his head made it important that the pilot "must be sure he had not wherewith to make satisfaction." *Id.* at 1180–81.

**12.** The Observation on Arts. XXIII and XXIV, Rules of Oleron, the authorship of which is unknown, points out:

## Who is a Pilot?

Here I am dealing primarily with those localized persons who come aboard the ship to assure successful navigation of the vessel through the local shoals, eddies, sandbars, influence of localized tides, wind, currents and the ever-growing industrial installations emerging from the commercial developments of the area. I am not dealing with those described as "pilots" who are permanently aboard the vessel.[12]

## All Agree Role of Pilot is Clear

One of the most authoritative resumes is that of D. Bederman's article on Compulsory Pilotage.[13] He states:

> For as long as men have taken to the sea, pilots have guided their journeys. Pilots were known to antiquity, and rules for their conduct were provided as early as Roman times and the Middle Ages. The first instance of mandatory pilotage

> Observation on the Two Foregoing Articles.
> The original calls these pilots "locmen"; for when those laws were written, there were officers aboard all ships, called pilots, who went the whole voyage, whereas the locmen were like our pilots, mariners hired at every river to guide the ship; for, dwelling on the place, the locman was supposed to know the shore better than the ship's pilot, who perhaps was never there before; for which reason he commonly required the master to have a locman, to avoid rocks, shelves, shoals and sands, which he must be well acquainted with by long using the river: that of Roan is very dangerous on this account, and there are sworn pilots every two leagues to guide ships up the Seine. They are very necessary all over Brittany. The forty-fourth and fifty-nineth articles of the Ordinances of Wisbuy, oblige the master to take a new pilot, if his own and the ship's crew demand one of him. The master finds him maintenance, and the merchant pays him, by the sixtieth article of the Ordinances of Wisbuy. The loss of the pilot's head, if through his ignorance or negligence the ship is lost, is taken from the Consolato, c. 250,—and answers to that known maxim in the law, 'Qui non habet in aere, luet in corpore.'
> Rules of Oleron, *supra* n. 3, 30 F.Cas. at 1181.

**13.** Bederman, *Compulsory Pilotage, Public Policy, and the Early Private International Law of Torts,* 64 Tul.L.Rev. 1033 (1990) [hereafter, Compulsory Pilotage]; *see id.* at 1041 n. 21.

was probably made in the Ordonances de Wisbuy ... propounded ... in the twelfth century.

.    .    .    .    .

The rationale for compulsory pilotage is straightforward enough. Navigation in and out of ports and harbors, and within restricted waters, poses special hazards that are not presented when sailing on the high seas.... Foreign vessels that are unfamiliar with local conditions require a navigator skilled and knowledgeable in those ways.[14]

### Congress Has Legislated on Pilots

Congress in its very first year was both conscious of the system of state-imposed compulsory pilotage and the need for the national government to permit the continuation of this system when it adopted the Act of August 7, 1789.[15]

By this Act Congress recognized the applicability of state compulsory pilotage statutes until Congress legislated specifically. It did so when Congress passed the Act of 2d of March 1837 [16] restricting the rights of adjoining states by authorizing the master to accept a pilot certificated by any of the adjacent states.

### Supreme Court Spoken Often, Consistently on Pilots

The Court first spoke in *Cooley* upholding the constitutionality of the Act of 1789.[17]

The Court was emphatic that it realized both the importance of state-imposed compulsory pilots and their importance to the free flow of commerce:

Now, a pilot, so far as respects the navigation of the vessel in that part of the voyage which is his pilotage ground, *is the temporary master charged with the safety of the vessel* and cargo, and of the lives of those on board, and intrusted with the command of the crew. He is not only one of the persons engaged in navigation, but he occupies most important and responsible place among those thus engaged.[18]

Though engaged and on board only temporarily, the pilot is supreme in his sphere:

It is true that, according to the usages of modern commerce on the ocean, the pilot is on board only during a part of the voyage between ports of different states, or between ports of the United States and foreign countries; but if he is on board for such a purpose and during so much of the voyage as to be engaged in navigation, the power to regulate navigation extends to *him while thus engaged,* as *clearly as it would if he were to remain on board throughout the whole passage,* from port to port.[19]

Even more recently the Court in *Bisso* gives contemporary vitality to these propositions:

Pilots hold a unique position in the maritime world and have been regulated ex-

---

14. *Id.* at 1041–42 (footnotes omitted).

15. *See supra* n. 8. This was the subject of *Cooley v. Board of Wardens, supra* n. 7.

16. Quoted in *Cooley, supra* n. 7, 53 U.S. at 317, 13 L.Ed. at 1004.

"That it shall and may be lawful for the master or commander of any vessel coming into or going out of any port situate upon waters which are the boundary between two states, to employ any pilot duly licensed or authorized by the laws of either of the states bounded on the said waters, to any law, usage, or custom to the contrary notwithstanding."

(Codified as amended at 46 U.S.C. § 8501(b).)

17. And when we look to the nature of the service performed by pilots, to the relations which that service and its compensations bear to navigation between the several States, and between the ports of the United States, and foreign countries, we are brought to the conclusion, that the regulation of the qualifications of pilots, of the modes and times of offering and rendering their services, of the responsibilities which shall rest upon them, of the powers they shall possess, of the compensation they may demand, and of the penalties by which their rights and duties may be enforced, do constitute regulations of navigation, and consequently of commerce, within the just meaning of this clause of the Constitution.

*Id.* at 316, 13 L.Ed. at 1003.

18. *Id.* (emphasis added).

19. *Id.* at 316, 13 L.Ed. at 1003–04 (emphasis added).

tensively both by the States and Federal Government.... Under law and custom they have an independence wholly incompatible with the general obligations of obedience normally owed by an employee to his employer.... As a rule, *no employer, no person can tell them how to perform their pilotage duties.* When the law does not prescribe their duties, pilots are usually free to act on their own best judgment while engaged in piloting a vessel.[20]

Then came actions beginning with the Act of 1852,[21] culminating in the Act of 1871 and 1873.[22] By these actions Congress legislated that all coastwise vessels, be piloted by a federally licensed pilot, and free from state compulsory piloting statutes in the coastwise trade. Continued application of state compulsory pilotage laws for vessels under Registry[23] touching or engaging in commerce at a foreign port was mandated.

### Legal Rights of Pilots and Consequences of Pilot Negligence

To stimulate compliance with the constitutionally upheld local compulsory pilotage laws, "another tack was adopted. Vessels entering or leaving a port were required to pay a pilotage fee whether the shipmaster accepted a pilot or not."[24] Not only does the pilot have a lien *in rem* for pilotage services, and also for tendered but refused services,[25] *The China*[26] holds the ship liable *in rem* although not *in personam*[27] for pilot errors.

Equally demanding is the holding that failure to take a compulsory pilot renders the vessel unseaworthy in a cargo damage case.[28]

### II.

### A Pilot is a Jones Act Seaman

Thus we have seen: Pilotage has been the subject of immediate legislative concern and action; by it Congress, in recognition of the indispensability of pilots, has constitutionally authorized state laws compelling, under pain of criminal sanction, the use of state licensed pilots on vessels under Registry; the presence of a licensed pilot is so important that the law of unquestioned authority as declared by the Supreme Court holds the pilot in supreme command over master and crew so that the pilot's orders can only be countermanded in the face of obvious, glaring incompetence and neglect; the failure to have on board a compulsory pilot subjects the vessel to substantial civil liabilities.

**20.** *Bisso v. Inland Waterways Corp.,* 349 U.S. 85, 93–94, 75 S.Ct. 629, 634, 99 L.Ed. 911, 919 (1955) (emphasis added).

**21.** Act of Aug. 30, 1852, chap. 106 (10 Stat. 61), cited in *Anderson v. Pacific Coast S.S. Co.,* 225 U.S. 187, 196, 32 S.Ct. 626, 629, 56 L.Ed. 1047, 1052 (1912), pertained not to harbor pilots, but to those entitled such and serving continuously on board as a part of the ship's company.

**22.** Act of Feb. 28, 1871, chap. 100 (16 Stat. 440); Act of Dec. 1, 1873, 52 R.S. §§ 4401, 4444, U.S.Comp.Stat.1901, pp. 3016, 3037; cited in *Anderson,* 225 U.S. at 190–94, 197, 32 S.Ct. at 627–28, 56 L.Ed. at 1048–49, 1052.

**23.** Vessels in foreign trade, i.e., between or touching foreign ports, must be Registered. Those in the coastwise trade (not including via the Panama Canal) are Enrolled or Licensed. *Id.* at 199, 32 S.Ct. at 630, 56 L.Ed. at 1053.

**24.** *Compulsory Pilotage, supra* n. 13, at 1043 and n. 29 (referring to *Ex parte McNiel,* 80 U.S. (13 Wall) 236, 279, 20 L.Ed. 624 (1871) (1681 Ordinance of Louis XIV penalized such a violation with corporal punishment)).

**25.** *Anderson, supra* n. 21 (negligence of a compulsory pilot gives rise to a maritime lien against the offending vessel).

**26.** 74 U.S. (7 Wall) 53, 19 L.Ed. 67 (1868) (holding vessel liable *in rem* for negligence of compulsory pilot); and *see, Compulsory Pilotage, supra* n. 13, at 1058 n. 111, and 1059.

**27.** *See* G & B, *supra* n. 3, at 599 n. 25, and accompanying text (citing *Homer Ramsdell Transp. Co. v. La Compagnie Generale Transatlantique,* 182 U.S. 406, 21 S.Ct. 831, 42 L.Ed. 1155 (1901)); and *id.* at 520 nn. 133–36, and accompanying text.

The harshness of this result is ameliorated by the Extension Admiralty Act, 46 U.S.C.App. § 740; *see* G & B, *supra* n. 3, at 523 n. 151.

**28.** *The Framlington Court,* 69 F.2d 300, 304 (5th Cir.1934).

In the face of these formidable factors, it is simply inconceivable that Congress, in that era (1915–1920) of its striving to afford effective statutory relief to all maritime workers, would exclude from the broad term "seaman" one so vital, so indispensable, so legislatively recognized as a compulsory pilot.

The Jones Act in its fullest state [29] extends its protection to seamen. Nowhere does the Act define who are *seamen*. Elsewhere Congress defines seaman in broad terms:

> (3) "seaman" means an individual (except scientific personnel, a sailing school instructor, or a sailing school student) engaged or employed in any capacity on board a vessel.

46 U.S.C. § 10101.[30]

The legislative history of the Jones Act is scarce indeed. All that appears has to do with venue provisions.[31]

Beginning its efforts in 1915, Congress enacted an omnibus statute which in the eyes of *Gilmore and Black* was a patent misreading of *The Osceola's* [32] emphasis on the fellow servant doctrine. Playing tit for tat the Court in *Chelentis v. Luckenbach S.S. Co.*[33] held the 1915 Act ineffective for not having legislatively ordained *respondeat superior*.

Certainly the Supreme Court has given the Jones Act the broadest sweep.[34] To begin with there is *International Stevedoring Company v. Haverty* [35] in which Justice Holmes, in his "words are flexible" approach held a longshoreman to be a Jones Act seaman. So the Court did in *Senko v. LaCrosse Dredging Corp.;* [36] *Grimes v. Raymond Concrete Pile Co.;* [37] *Butler v. Whiteman;* [38] and *Gianfala v.*

**29.** 46 U.S.C.App. § 688:

(a) Application of railway employee statutes; jurisdiction

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such action shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

(Amendments 1982 not applicable.)

**30.** This definition had its genesis in Act of Dec. 21, 1898, c. 28, §§ 23, 26, R.S. § 4612 (30 Stat. 762, 764) (codified prior to reenactment at § 10101 at 46 U.S.C.App. § 713), and was derived from Act of June 7, 1872, c. 322, § 65, 17 Stat. 277.

**31.** *See Brown v. C.D. Mallory & Co. et al.,* 122 F.2d 98, 102 n. 8 (3d Cir.1941) (en banc):

The controversial sentence of Section 20 was added as a result of the action of a conference committee of the Senate and House of Representatives. See 59 Cong.Record, Part 7, p. 7044, and House Report 1093, 66th Congress,

2nd Session. In the "Statement of the Managers on the Part of the House", p. 35 of the report just mentioned, appears the following in respect to the amendment, "This amendment amends Section 20 of the seaman's act so as to extend the Federal Employers' Liability Act to cases of personal injury to or death of seamen. The House recedes with an amendment that jurisdiction of all actions brought under the provisions of Section 20 shall be under the court of the district in which the defendant employer resides or in which his principal office is located." We can find no reference in the debates of either House to the statute under consideration. It seems to have been dealt with entirely in committee. The language of the report, however, is really no broader than that of the statute.

**32.** 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903).

**33.** 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171 (1918).

**34.** *See* G & B, *supra* n. 3, at 325–33.

**35.** 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157 (1926).

**36.** 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957).

**37.** 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737 (1958).

**38.** 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958).

*Texas Co.*[39]

Within six months of the *Haverty* decision Congress enacted the Longshoremen's and Harborworkers Compensation Act (LHWCA),[40] which extended compensation benefits to all maritime workers except masters and "members of a crew of [a] vessel." The Court in *Swanson v. Marra Bros.*[41] held "the effect of these [LHWCA] provisions is to confine the benefits of the Jones Act to members of the crew of a vessel plying navigable waters."

This has given rise to frequent expressions capsulated in Judge Rubin's opinion for us, *Guidry v. South Louisiana Contractors, Inc.*[42] that the terms "seaman" and "member of a crew" are now used interchangeably.

But considering the indispensable nature of the calling of a compulsory state pilot, the interchange of "seaman" and master and "member of a crew of a vessel" ought not to cut off a pilot from being under the congressional contemplation of seaman in 1920. A pilot is no stranger to navigation and operation of an ocean-going vessel. A pilot is not one incidental to the maintenance of maritime commerce in the *Executive Jet*[43] or world-wide operational sense. Indeed his/her work is the very essence of maritime commerce.

Certainly a pilot is a full-fledged member of the ship's company. And looking at it from 1920 and 1927 viewpoints, Congress did not mean to exclude from the protection of the Jones Act compulsory pilots

while aboard and directing the navigation of a vessel. Nor does my analysis ignore or disparage Judge Wisdom's creative contribution of *Robison*[44] leading principally to the en banc in *Barrett*,[45] nor its insistence upon some more or less permanent relation to a vessel or identified group of vessels. *Robison* was borne principally out of that great class of non-descript floating craft and myriad operations in the exploration and development of off-shore oil activities.

A compulsory pilot is in no sense comparable to those incidentally related to a vessel. Such pilot is indispensable. The vessel may not operate without him/her. That pilot is in supreme command of the basic function of the vessel—to navigate in maritime commerce. That person is a seaman or he/she is nothing.

### III.

*In Agreement With Court's Other Holdings*

I agree there is no § 905(b) negligence liability in the boarding ladder, failing to administer resuscitations or on *Sieracki* unseaworthiness.

.      .      .      .      .

My dissent ends as it began: the unjustifiable exclusion of a state compulsory pilot as a Jones Act seaman.

**39.** 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 775 (1955).

**40.** Act of Mar. 4, 1927, 44 Stat. 1424, 33 U.S.C. § 901 *et seq.*

**41.** 328 U.S. 1, 7, 66 S.Ct. 869, 872, 90 L.Ed. 1045, 1049 (1945).

**42.** 614 F.2d 447, 452, n. 2.

The term "seaman" is contained in the original Jones Act enacted in 1920. In 1927 Congress enacted the Longshoremen's and Harborworkers' Compensation Act, 33 U.S.C. § 901 *et seq.*, which extended to all maritime workers except masters or "members of a crew of [a] vessel." The Supreme Court held that the effect of the Act to "members of a crew of [a] vessel." *Swanson v. Marra Bros.,*

*Inc.,* 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1946). The terms "seaman" and "members of a crew" are now used interchangeably.

**43.** *Executive Jet Aviation v. City of Cleveland, Ohio,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972); *see also, Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982).

**44.** *Offshore Co. v. Robison,* 266 F.2d 769 (5th Cir.1959).

**45.** *Barrett v. Chevron,* 781 F.2d 1067 (5th Cir. 1986) (en banc), now the subject of review in the pending grant of certiorari in *McDermott International, Inc. v. Wilander,* 887 F.2d 88 (5th Cir.1989), *cert granted,* —— U.S. ——, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990).