WICKER, Judge.
Weber Marine, Inc.; Weber Management Services, Inc.; and West of England Shipowners Mutual Insurance Association (London) Ltd. appeal a jury verdict in favor of plaintiff, Stanley Seymour, who has answered the appeal. The issues are whether or not there was evidence from which the jury could have concluded that Seymour was a seaman for Jones Act purposes and whether he has been awarded sufficient damages. We affirm.
Seymour was an employee of Weber Marine, a company engaged in inland marine services. Weber Management was a payroll entity. Seymour’s first day on the job resulted in an injury to his ankle when a forklift truck went out of control. Weber’s compensation insurer, CIGNA Insurance Company of North America, paid benefits under the Longshore and Harbor Workers’ Compensation Act, 33 U.S.C. § 901 et seq. Seymour then sued CIGNA/INA; Weber; and its liability insurer, West of England, for damages under the Jones Act, 46 U.S.C.App. § 688, and the general maritime law. CIGNA/INA intervened to recover the medical and compensation benefits it had paid Seymour.
Weber and West of England moved for summary judgment on Seymour’s claims of unseaworthiness and seaman status. Summary judgment was granted on the unseaworthiness issue, and the seaman status issue was reserved for a jury trial. After four days of testimony, the jury awarded Seymour a total of $240,000.00. That judgment also dismissed CIGNA/INA on a directed verdict; awarded it $23,898.73, the stipulated past medical expenses, on its intervention; and fixed as additional costs certain expert witness fees, videotape deposition costs, and jury lunches.
Weber and West of England now allege
The jury erred in finding plaintiff, Stanley Seymour, to be a seaman when the only reasonable evidence adduced at trial established: he was assigned to work exclusively as a day laborer unloading a supply truck located in a parking lot; he was not permanently assigned to any vessel in Weber’s fleet; he was merely transported on one of Weber's vessels to the job site; he performed no substantial work on that vessel; and he was solely engaged in land-based unloading activities at the time of his accident. *841 They do not raise amount of the damage award as an error. Seymour has answered the appeal, asking for an award of punitive damages, attorney’s fees, increased compensatory damages, and sanctions for frivolous appeal. Weber and West of England represent to this court that Seymour’s answer was untimely; however, our review of the record shows otherwise.
SEAMAN STATUS
46 U.S.C.App. § 688 (Jones Act) provides a remedy for a “seaman” who is injured in the course of his employment. The definition of “seaman”, at issue in this case, is not found in the statute but must be gleaned from the jurisprudence. This jurisprudence, covering almost a century of cases, has been often confusing and inconsistent, as has been noted in McDermott Intern., Inc. v. Wilander, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991). However, the Supreme Court concluded,
The key to seaman status is employment-related connection to a vessel in navigation. We are not called upon here to define this connection in all details, but we hold that a necessary element of the connection is that a seaman perform the work of a vessel.... In this regard, we believe the requirement that an employee’s duties must “contribut[e] to the function of the vessel or to the accomplishment of its mission” captures well an important requirement of seaman status. It is not necessary that a seaman aid in navigation or contribute to the transportation of the vessel, but a seaman must be doing the ship’s work.
Ill S.Ct. at 817.
The federal Fifth Circuit, while citing Wilander, still has held that the injured worker must meet the two-prong test of Offshore Co. v. Robinson, 266 F.2d 769 (C.A. 5th Cir.1959): he or she must be permanently assigned to a vessel or perform a substantial part of his or her work aboard a vessel, and his or her duties must contribute to the function of the vessel or the accomplishment of its mission. Easley v. Southern Shipbuilding Corp., 965 F.2d 1 (C.A.1992); Michel v. Total Transp., Inc., 957 F.2d 186 (C.A.1992).
The requirement of permanent attachment to a vessel may have been called into question, however. In Bach v. Trident Steamship Co., Inc., 920 F.2d 322 (C.A. 5th Cir.1991), a compulsory river pilot, who had no permanent attachment to the vessel he was preparing to pilot, collapsed of a heart attack shortly after reaching the bridge. He sued under the Jones Act, and the trial court dismissed his claims. The Fifth Circuit affirmed, finding that “[h]is transitory work aboard the [ship], which lacked any degree of regularity and continuity, does not constitute either permanent attachment to or substantial work aboard that vessel.” At 324. It refused to make an exception to the Robinson test because to do so “would make our seaman test unnecessarily uncertain and ambiguous.” At 326. The Supreme Court, however, granted writs of certiorari, vacated the decision, and remanded Bach for reconsideration in light of Wilander. On remand, the Bach court reinstated its prior opinion, stating, “Wil-ander has no effect” on its opinion. 947 F.2d 1290 (C.A.1991), cert. denied — U.S. -, 112 S.Ct. 1996, 118 L.Ed.2d 592 (1992).
Louisiana state courts have previously relied upon the Robinson test, as in Sider v. Robin Temporary Service, 515 So.2d 1123 (La.App. 5th Cir.1987), writ denied, 519 So.2d 146 (La.1988), and Martin v. G. & A LTD., 604 So.2d 1014 (La.App. 3rd Cir.1992). The Fourth Circuit, in Folse v. Western Atlas Intern., Inc., 580 So.2d 482 (La.App.1991), also held that the injured worker must meet both prongs of the Robinson test and affirmed a summary judgment dismissing the claim of a seismic operator who did no more than half his work aboard ships which were not in fact owned by his employer. Our Supreme Court reversed and remanded the case for trial, noting that Wilander “emphasized employment-connection to a vessel in navigation as the sole test of coverage” under the Jones Act. 593 So.2d 341, 342. It also noted that Wilander “does not mention more or less permanent attachment to a *842 vessel or fleet of vessels”, the first prong of Robinson.
Seymour, who was twenty-eight years old when he was injured on December 17, 1988, dropped out of school in about the sixth grade and had minimal academic skills. He worked at minimum wage jobs like gas station attendant until at age eighteen he was old enough to go to work on the river. He worked for various marine companies, including Weber, as a deckhand over the next few years. He eventually got his inland marine pilot’s license in 1986, and he did work as a pilot prior to his last employment with Weber.
Seymour applied to pilot a tugboat with Weber on December 9, 1988; and he was hired. However, no work was immediately available. He did report to work on December 17th; and Weber listed him on its records and paid him as a day laborer.
Here the tale diverges. Seymour testified that he was called on the evening of December 16th to report to work the next day to pilot the Ernest D. He drove from his home in Metairie to Weber’s Burnside facility, but he was told the Ernest D. was out of commission that day. He asked if there was something else he could do, since he had driven all the way from Metairie for nothing. Weber, according to Seymour, put him to work on the Mar G, another tugboat.
That tug made a run from Weber’s Burnside facility to Weber’s Reserve facility, where it was supposed to pick up a pallet of paint for transport to a ship. Earl Spur-lock, the pilot, and the regular deckhand were aboard the Mar G. Seymour worked as a deckhand on that run, checking the oil, pumping the bilge, and handling the ropes with the other deckhand. The trip took two or three hours, and there wasn’t much to do aboard the tugboat.
When they got to Reserve, everyone but the pilot went to see if the paint was ready. Spurlock was unable to start the forklift and had to charge the battery. When Seymour called on Spurlock for help removing the plastic wrap from the paint, Spurlock left the forklift running. Seymour noticed the forklift creeping up and he yelled. He was unable to get himself out of the way in time and his ankle was jammed between the paint and the basket.
Weber, on the other hand, disputed Seymour’s claim to be a seaman by pointing out the following testimony.
Dennis Leroy Adair, pilot of the Mar G, testified by videotaped deposition that he no longer worked for Weber and had no interest in the outcome of the trial. The Mar G has only one pilot and one deckhand. While it would be possible to have two deckhands, he testified, “I hadn’t seen it done.” During the two weeks he piloted the Mar G he never had any deckhand but Freddie Franklin. Seymour was riding only as a passenger from the main office in Burnside to Reserve and did not work as a deckhand or perform any work aboard the Mar G or contribute in any way to the mission or function of the Mar G on December 17th.
On cross examination Adair conceded that he was not privy to any conversations between Seymour and whoever assigned him his duties and, consequently, didn’t know what Seymour was told to do that day. He did know that he was supposed to pick up a load of groceries and take it to an anchored ship. When the accident happened, he was in the wheelhouse and Franklin, Spurlock, and Seymour were unloading the truck. It was unusual for Franklin to have been helping to unload the truck. He conceded he might, when he worked as a deckhand before becoming a pilot, perhaps once or twice a year, work on the land when his boat was sitting at the dock. When this happened, he would be paid as a deckhand. He appeared to concede that Seymour was helping the boat to accomplish its mission by getting supplies aboard.
On redirect examination Adair reiterated that when a deckhand assisted a day laborer, he was paid as a deckhand.
Donald Hawthorne, assistant manager of the maintenance shop for Weber, testified on cross examination that he used to run crew boats before working in the shop. Day laborers are the ones who operate forklifts, and Spurlock is head of the day *843 laborer crew. However, a crew boat operator might also run the forklift. He explained, on redirect, “The crew boat doesn’t run constantly. They wait to pick up passengers off the ship. If they got to move something around like their gangway for the walkway they do it.”
Earl Spurlock, labor foreman, testified that he assumed Seymour was a day laborer because he was working with him to unload paint. Seymour was the only one working with him the date of the accident, although sometimes deckhands will help even though they are not assigned to do that. According to Spurlock, Seymour probably would have ridden the Mar G out to the ship to unload provisions if he hadn’t been hurt. Spurlock said he had nothing to do with Seymour’s time sheets, his status, or his title with Weber.
On cross examination Spurlock testified that day laborers get their assignments from the site manager and/or the dispatcher, not from the captain or deckhand. Neither he nor Seymour were assigned to the Mar G as deckhands or captain. He and his crew are longshoremen; they work off the land. When he was on a vessel, it was either as a passenger or to unload cargo. He and Seymour were on the Mar G only as passengers and did no work on the vessel and didn’t contribute to the vessel. In his opinion and in contrast to his earlier testimony, Spurlock said Seymour probably would not have ridden the Mar G out to the ship to unload only one pallet, because one deckhand was sufficient to handle it.
On redirect examination Spurlock testified that he didn’t know what Weber may have told Seymour his job was.
Robert Wooten, Weber’s vice president, secretary, and treasurer, testified that Seymour was hired as a pilot. He didn’t participate in Seymour’s assignment on the day of the accident since he was not involved in everyday crew matters, but he was aware of it. He did note that Seymour worked for Weber as a pilot when he returned to work in July of 1989.
According to Wooten, day laborers are hired on an as-needed basis to load and unload trucks. They just show up and, if there is work needed, they are hired and paid by the hour. Boat operators and deckhands are paid by the day. In discussing the pay sheets, he testified that the people listed on the left hand side are permanently attached to a vessel and “work on the same boat every day with the same crew.” The dispatcher fills out the payroll sheets.
Wooten said the Mar G generally has one pilot and one deckhand, but on rare occasions more than one deckhand would be hired if there are more supplies than one man can handle. With only one pallet of paint to be unloaded, there would not have been two deckhands. When that occurs, both men will be listed on the left side of the pay sheet. He testified that Seymour is listed as a day laborer on the pay sheet and that he doesn’t show up on any time sheets from December 9th through 17th as a pilot or a deckhand. Wooten concluded that on December 17th, Seymour was paid as a day laborer, he didn’t operate or serve as a deckhand on a vessel, he was never assigned to any vessel, and he didn’t perform a substantial part of any of his work aboard a vessel.
On cross examination Wooten admitted that Seymour was hired as a pilot. He didn’t participate in the day-to-day hiring and firing. The dispatcher directs where employees will work on any given day. When questioned about a “Mike Martinez” who appeared on the payroll sheet, Wooten admitted that the dispatcher “put [M]ar-tinez in the wrong spot” but that he was paid as a pilot even though he was in the day laborer column. He explained that this was an inexperienced dispatcher.
“The standard of review in state court on Jones Act claims is governed by federal law and jurisprudence. The jury’s findings of fact cannot be disturbed by an appellate court unless there is no reasonable evidentiary basis for the jury’s conclusion.” Simmons v. Hope Contractors, Inc., 517 So.2d 333, 339 (La.App. 1st Cir.1987), writ denied 518 So.2d 510 (La.1988), citing Daigle v. Coastal Marine, Inc., 488 So.2d 679 (La.1986) and Trahan v. Gulf Crews, Inc., 260 La. 29, 255 So.2d 63 (La.1971). We cannot *844 say that there was no reasonable evidentia-ry basis for the jury’s conclusion that Seymour was doing the ship’s work.
His own testimony, while not conclusive, is certainly positive and credible. In addition there was no testimony from those who assigned Seymour his day’s work and there was evidence that sometimes mistakes were made on payroll records. We do not consider his receipt of LHWCA benefits dispositive of the issue of seaman status. When an injured worker receives LHWCA benefits without a formal award while awaiting trial, he is not barred from seeking relief under the Jones Act. Southwest Marine, Inc. v. Gizoni, — U.S. -, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991). We affirm the factual finding that Seymour was a seaman for Jones Act purposes on the day he was injured.
DAMAGES AND PENALTIES
Seymour complains that the jury’s award of general damages was inadequate, that Weber’s gross and wanton negligence in causing his injury and actions in withholding certain medical benefits merit punitive damages, and that Weber should be further punished by the imposition of sanctions for a frivolous appeal.
There is undisputed evidence that Seymour underwent two surgeries on his ankle, one to fix the fracture and a second to remove the hardware. His orthopedic surgeon, John J. Watermeier, M.D., treated him every month from his injury until the trial almost four years later; and during this time Dr. Watermeier regularly prescribed muscle relaxing and pain killing drugs and occasionally injected the ankle with cortisone. In addition Seymour had two diagnostic procedures which involved the placement of a six-inch needle into his spine, while fully awake, in order to inject anesthesia into his sympathetic nervous system. If he takes Dr. Watermeier’s advice, he will undergo a sympathectomy, a procedure in which the sympathetic nerves running along the spine are cut. Thus, we have no difficulty concluding that Seymour has suffered, and probably will suffer, considerable pain in connection with his injury.
On the other hand, Gordon Nutik, M.D., an orthopedic surgeon who examined Seymour for CIGNA and Weber Marine, noted that Seymour had the same amount of callus on the bottom of both feet, indicating that he was walking and weight bearing without favoring one foot over the other. Seymour testified that he still walks, drives, and takes care of his young children, although he has had to give up swimming, roller skating, football, and bicycle riding.
Damages for pain and suffering are necessarily subjective and impossible to measure precisely, so the trier of fact is given a great deal of discretion in assessing them. La.C.C art. 1999; Reck v. Stevens, 373 So.2d 498 (La.1979). While we believe the $35,000.00 award to be on the low side, we do not believe the jury abused its discretion in fixing general damages and affirm this award.
Seymour also complains that CIGNA was arbitrary and capricious by its alleged delay in providing the cure to which he was entitled. He admits that CIGNA and/or Weber Marine have paid all the medical bills presented to them with the exception of the costs of recommended surgery to sever the sympathetic nerves. Despite the payment, however, he argues that CIGNA and/or Weber Marine delayed in approving the two sympathetic nerve blocks for the purpose of diagnosing reflex sympathetic dystrophy, a condition in which the sympathetic nerves are overly stimulated due to injury.
Dr. Watermeier testified that he sent all his reports to either CIGNA or Weber Marine. He recommended a diagnostic ther-mogram in October of 1989, and it was six months before it was done. He also recommended a bone scan in November of 1989, and it was not done until June of 1990. His clinic needed approval from a guarantor before these tests could be scheduled. In his opinion the wait between his recommendations and the actual performance of the tests was unreasonable. Again, he recommended a sympathetic nerve block in June of 1990, and it was not done until *845 October of 1990. A second block was not done until June of 1991. No one from CIGNA ever contacted him about the recommended sympathectomy, and the passage of time makes the prognosis poorer and more difficult.
On cross examination Dr. Watermeier noted that it was his staff who actually sends the reports to the insurance company; and he admitted that either Weber Marine or CIGNA had paid for every visit, averaging one a month since Seymour’s injury, without requiring an authorization each time. He also testified that CIGNA and/or Weber Marine paid for both surgeries, and he conceded that not all the delays were caused by CIGNA and/or Weber Marine: some delay was due to scheduling problems, some was due to the necessity for a followup exam by Dr. Nutik, and some was due to the time required to have tests and x-rays reviewed.
We believe that this evidence falls short of the proof of arbitrary and capricious failure to pay cure. While there were delays in getting approval for some procedures, they were not the sort of delays one could characterize as arbitrary and/or capricious. To date, everything recommended by Dr. Watermeier has been approved and paid for but the sympathecto-my; and that decision was founded upon Dr. Nutik’s opinion that Seymour was not suffering from reflex sympathetic dystrophy. This constitutes the kind of reasonable investigation and corroboration of a claim envisioned in Morales v. Garijak, Inc., 829 F.2d 1355 (C.A. 5th Cir.1987).
Seymour also claims error in the judge’s dismissal of a claim against Weber Marine for gross and wanton negligence. He argues that Spurlock’s actions, and those of his employer, Weber Marine, were grossly and wantonly negligent because Spurlock was an untrained and inexperienced forklift operator. The evidence belies this contention, as Spurlock testified of many years’ experience in operating forklifts. That he was negligent in leaving the equipment running and unattended is clear, but this does not constitute gross and wanton negligence.
Finally, Seymour claims that this appeal was frivolous. The issue of seaman status, as we have noted earlier, has been resolved in contradictory and confusing ways. We do not find the appeal of Weber Marine and West of England was taken solely for the purpose of delay or that these appellants and their counsel did not seriously believe in their legal position.
We affirm the judgment in favor of Stanley Seymour and against Weber Management Services, Inc.; Weber Marine, Inc.; and West of England Shipowners Mutual Insurance Association (London) Ltd. in the amount of $240,000.00. Weber and West of England must pay the costs of this appeal.

AFFIRMED.